**GEORGIA–PACIFIC CORPORATION,
Appellant,**

v.

**U. S. PLYWOOD–CHAMPION PAPERS
INC., Appellee.**

**Nos. 415, 416, Dockets 35341, 35444.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 16, 1971.

Decided June 15, 1971.
Certiorari Denied Oct. 12, 1971.
See 92 S.Ct. 105.

John Vaughan Groner, New York City (Fish & Neave, Ronald F. Ball, New York City, on the brief), for appellant.

Raymond T. Heilpern, New York City (Baer & McGoldrick, William D. Zabel, Heilman & Heilman, James M. Heilman, New York City, on the brief), for appellee.

Before LUMBARD, SMITH and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

Georgia-Pacific Corporation (GP) appeals from a judgment of the United States District Court for the Southern District of New York, Charles H. Tenney, J., which awarded U. S. Plywood-Champion Papers Inc. (USP) $800,000 damages for infringement of a patent plus interest at the rate of six per cent per annum from the date of last infringement, September 1, 1958. For the reasons stated below, we reduce the award to $570,000.

In the spring of 1955, GP began to market a decorative striated plywood wall panel. Acknowledging that USP held patents on this type of paneling, GP instituted an action for declaratory judgment that the three patents involved were invalid and not infringed. The United States District Court for the Southern District of New York, William B. Herlands, J., initially found the patents invalid, 148 F.Supp. 846 (1956), but this court reversed and held one of the patents (Deskey) valid and infringed. 258 F.2d 124 (2d Cir.), cert. denied, 358 U.S. 884, 79 S.Ct. 124, 3 L. Ed.2d 112 (1958). Upon remand, the case was referred to a Special Master for an accounting covering the period March 1955 to September 1958. The Master recommended that USP should be awarded GP's net profits of $655,837. After a hearing in the district court, Judge Herlands reversed the Master's ruling, holding that GP's profits did not constitute the proper measure of recovery and that damages should be computed on the basis of a reasonable royalty. 243 F.Supp. 500 (S.D.N.Y. 1965). A series of hearings on the reasonable royalty issue were subsequently held and a draft opinion was substantially completed, but Judge Herlands died before the decision was actually rendered. The case was assigned for all purposes to Judge Tenney and the parties signed a stipulation providing, *inter alia,*

> that [the court] shall have the full and unlimited right to use or not to use all or any part of said draft of opinion, notes and memoranda, with or without acknowledgment of its source, as though the same were a part of the record made herein.

Judge Tenney thereafter rendered the award of $800,000 that forms the subject of this appeal. 318 F.Supp. 1116 (S.D. N.Y. 1970).

## I.

The statutory authority for the district court's award was 35 U.S.C. § 284, which provides in relevant part that

> the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer
> * * *.

The parties seem in essential agreement that the trial court correctly chose to apply the "willing buyer-willing seller" rule in determining a reasonable royalty under that section. This rule contemplates a suppositious meeting in advance of infringement between patent owner and potential infringer in order to work

out a license agreement. The trial court found a wide range of factors relevant in such hypothetical negotiations and carefully considered whether there was competition between USP's product (Weldtex) and other kinds of paneling; the effect of both the cyclical popularity of specialty plywoods and the short time the patent had to run; USP's profits on sales of Weldtex and collateral sales of other products occasioned by sales of Weldtex; GP's expected profits on both striated plywood and collateral sales; the importance of the Deskey patent relative to other processes necessary for producing the plywood and Weldtex's decorative quality; and whether there were comparable prevailing royalties on either Weldtex or similar products. The trial court's crucial finding appears to have been that USP made a profit of $48.64 per thousand square feet of Weldtex sold. This led to the subsidiary finding that GP could reasonably have expected to make at least that great a profit on its infringing sales of striated plywood. On the basis of these and other findings, the court granted USP a "reasonable royalty" of $50 per thousand square feet. While we sustain all of the trial court's basic findings, we modify its ultimate conclusion as to a reasonable royalty because we think it fails to leave GP a reasonable profit on its sale of striated plywood. GP, however, attacks many of these basic findings and to those arguments we turn first.

## II.

GP's first challenge is that the trial court misapplied the willing buyer-willing seller rule by placing an incorrect cut-off date on evidence respecting the commercial value of the patent. GP states that the court only allowed such evidence if it would have been known by February 1955, the time of the hypothetical negotiations, and excluded relevant factors which became known after that date.

Although GP may be correct in assuming that relevant factors occur-

ring after the infringement begins should be considered, cf. Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 697, 53 S.Ct. 736, 77 L.Ed. 1449 (1933), it is incorrect in asserting that the trial court did not do so. The trial court itself stated that:

> [This] Court [h]as taken into account the modifying effect of the facts developed subsequent to 1955 and has assessed them together with all other probative evidence so far as they bear upon the reasonableness of the assumptions and expectations of the parties in their hypothetical negotiations in 1955.

318 F.Supp. at 1122. And an examination of relevant portions of the record merely reveals that the court understandably gave greater weight to those factors apparent at the time of the suppositious negotiations than to those occurring two or more years later. Such action hardly constitutes reversible error.

GP's next set of arguments concerns the trial court's alleged miscalculation of USP's profits on the patented product (Weldtex). GP claims that the trial court erred in relying on (1) unqualified USP expert witnesses whose testimony was contrary to their experience and (2) "inappropriate" USP *pro forma* profit statements "based on speculation and guess."

As to the qualifications of USP witnesses Raymond Heilpern and Sol Antoville with respect to their testimony concerning USP's profits on Weldtex, we note that the trial court found their testimony not persuasive and set an average profit on Weldtex that was lower than that proffered by either USP witness. 318 F.Supp. at 1128–1129. Nevertheless, since the testimony of these witnesses was given considerable weight on other issues, see *id.* at 1143, we briefly consider GP's attack on their qualifications. The trial court made specific findings on that issue:

> Both Raymond T. Heilpern and Sol W. Antoville testified in person before Judge Herlands in behalf of USP.

The Court exercised the opportunity thus presented of questioning them. Their extensive appearance on the stand also afforded the Court ample opportunity to observe their demeanor and manner of testifying. Their professional and technical qualifications and their testimonial credibility and reliability appear to have impressed Judge Herlands, and their testimony is equally impressive to me.

*Id.* at 1142. The court also went on to characterize their testimony as "factually supported, authoritative, forthright, realistic, reasoned and specifically and concretely directed to the subject of striated fir plywood," *id.*, in sharp contrast to its finding that the GP experts were "not conversant with the business considerations in the marketing of striated fir plywood * * * [and] did not know anything about a licensing situation realistically comparable to that presented by the present case." *Id.*, at 1141. After consideration of the record, we see no reason to disturb these findings. See Fed.R.Civ.P. 52(a).

GP makes a number of objections to the use of USP's *pro forma* statements in estimating USP's profits on Weldtex. It contends that there was not enough allocated to costs because Weldtex requires a particularly high standard of face ply. The trial court made no specific finding on this issue but, in light of the existing testimony that the extra costs were unnecessary, we do not find the court's failure to allocate additional costs clearly erroneous. GP also argues that extra costs should have been allocated for advertising expenses. As noted by USP, however, the court found that Weldtex materially contributed to the sales volumes of other items, some of which were unadvertised, so USP's procedure of allocating advertising costs on the basis of a product's relative sales appears reasonable. In any event, the court's failure to add such costs is not clearly erroneous. The same holds true for the court's decision not to allocate greater costs to Weldtex on the ground that it was a "specialty" rather than a staple commodity. GP's other objections to the use of the *pro forma* statements are similarly without merit.

### III.

GP also contends that the trial court erred in failing to give sufficient weight to a myriad of factors which GP proffered below as undercutting the value of USP's patent. A listing of the trial court's findings on these questions follows: (1) USP's arrangement with the inventor Deskey had no significant probative bearing upon the issue of a reasonable royalty (318 F.Supp. at 1137–1138); (2) USP's licenses of the Deskey patent to other mills involved circumstances so different from the USP–GP situation as to be irrelevant in determining a reasonable royalty in this case (*id.* at 1138–1139); (3) there was no meaningful pattern of royalties in the industry relevant to the hypothetical negotiations (*id.* at 1139–1140); (4) the importance of the decorative quality of the striations did not undercut the value of the patent (*id.* at 1134–1137); (5) although specialty paneling is subject to popularity cycles, Weldtex had yet to lose its commercial value at the time of the hypothetical negotiations (*id.* at 1125–1126); (6) the fact that the patent had only four years to run was of minimal importance since the investment required was modest, the commercial success had been demonstrated, GP had the opportunity to get a head start on a product it intended to market after the patent expired and the royalty was a percentage of sales which did not tie GP to a fixed financial obligation (*id.* at 1126–1127); (7) Weldtex was relatively insulated from competition at the time of GP's infringement (*id.* at 1124–1125).

After careful consideration, we believe that the resolution of these issues by the trial court was correct.

### IV.

GP's last, and most substantial, challenge concerns its profits on striated plywood after payment of the supposi-

tious royalty. GP asserts, and the court below appears to have accepted, the proposition that under the willing buyer-willing seller rule a reasonable "royalty must be fixed so as to leave the infringer, or suppositious licensee, a reasonable profit."[1] See 318 F.Supp. at 1122. The trial court's award appears to acknowledge this standard:

> [A] royalty of $50.00 per thousand square feet payable by GP to USP would have enabled GP to realize a reasonable profit * * * GP's average realization on all its striated fir plywood sales throughout the infringement period was $159.41 per one thousand square feet * * * [and] after paying $50.00 per one thousand square feet to USP, the remainder of about $109.41 would enable GP to make a substantial profit * * *.

*Id.* at 1143. Yet we cannot square this result with the trial court's finding that GP would reasonably have expected to earn profits approximating USP's, $48.64 per thousand square feet. *Id.* at 1131. Even if a small degree of profit is added for collateral sales in order to justify the court's subsequent finding that "GP's reasonably expected rate of profit on the sale of striated fir plywood would

have been $50.00 per thousand square feet," *id.* at 1141,[2] the royalty imposed still gobbles up all of GP's expected profit. We also note that the trial court's $800,000 award more than encompasses the $685,837 which the Master found to be GP's actual profits.

Thus, although we affirm the other findings, we feel that despite the trial court's professed intention to do so, it did not allow GP a reasonable profit after paying the suppositious royalty. This is a basic error which should be corrected. We would, in fact, be inclined to remand for reconsideration were it not for the extraordinary length of time this litigation has already lingered and the willingness of the party ultimately paying the damages to have us dispose of the case. Accordingly, we turn to a redetermination of the award on the basis of the record before us.

Since the error was to leave GP no profit at all after payment of the suppositious reasonable royalty of $50 per thousand square feet, we must first determine what would be a reasonable profit for GP after payment of the royalty. We note that the Master found, on the basis of GP's annual reports, that GP's average net profit on sales of all

---

1. Judge Herlands also accepted this proposition for, even in his opinion which held that GP's profits were not the proper measure of recovery, he noted that:

> The size of an infringer's profits is often an influential factor in the determination of the amount of a reasonable royalty. * * *
>
> * * * * *
>
> In fact, the very definition of a reasonable royalty assumes, that, after payment, the infringer will be left with a profit. * * *

243 F.Supp. at 529, 539.

2. The trial court found that:

> [T]he figure of $48.64 per thousand square feet of striated fir plywood sold, representing GP's probable expectation of profit on that item alone, would not reflect the factor of GP's expectation of profits on collateral sales generated by the sale of striated plywood.

> The evidence does not permit an inference as to the quantum, even approximately, of the profits derivable from collateral sales by GP. To assess this factor separately and monetarily by assigning a dollar and cents valuation to it would involve impermissble conjecture and speculation. In the circumstances, therefore, the indisputable fact that such profits would be generated in a significant amount by the sale of striated fir plywood is treated by the Court as a factor strengthening USP's bargaining position and supporting the reasonableness of the figure of the profit rate on the sale of striated fir plywood.

318 F.Supp. at 1132. While we recognize the trial court's dilemma, its failure to quantify leaves us no recourse but to ignore profits on collateral sales or to assume that such profits were taken into account in arriving at the $50.00 figure for GP's reasonably expected profits. We choose the latter alternative.

products during the period of infringement was slightly over nine per cent of sales. Report of Special Master at 81. It follows that GP would have been willing to pay a royalty which, after payment of its other costs, would leave it nine per cent profit on sales of the licensed item.[3] Since the trial court found that GP's "average realization" on those sales was $159.41, 318 F.Supp. at 1143, such a profit would be $14.35 per thousand square feet in the present case. The remainder is arithmetic:

| | $ per thousand square feet |
| --- | --- |
| GP's expected profit on the item: | $50.00 |
| —9% profit on sales: | −14.35 |
| assumed reasonable royalty: | $35.65 [4] |

The district court apparently used a rounded-off figure of 16,000,000 square feet for GP's total sales of the infringing item. Using that figure and multiplying it by the reduced reasonable royalty of $35.65 per thousand square feet, we arrive at a rounded-off total award of $570,000. We realize that no one can be sure what the parties would have done had they actually negotiated. But determination of an assumed reasonable royalty is in essence a device for retroactively reaching a just result,[5] and we feel that a reasonable royalty of $35.-65 per thousand square feet is a fair one on the basis of the record before us. Accordingly, we modify the lower court's award of a reasonable royalty of $50,00 per thousand square feet to $35.65 per

3. GP can hardly argue that the 9% is too low a profit on striated plywood since the figures proffered before the Master indicated that GP found it worthwhile to continue production although its claimed profits were less than 6% of sales. See Report of Special Master at 81.

4. Our confidence in this result is somewhat bolstered by the way it approximates a straight arithmetic compromise between the least that USP witnesses testified they would accept ($50 per thousand square feet) and the "slight" indication, 318 F.Supp. at 1141–1142, from the testimony of GP's chief license negotiator that GP might have been

thousand square feet and determine that GP is liable in the amount of $570,000 before interest.

V

The district court's award of a reasonable royalty also granted "interest * * * from the date of the last infringement, September 1, 1958, to the date of payment of the award, at the rate of 6 per cent per annum." 318 F. Supp. at 1143. Both parties appeal from the decision as to interest. GP contends that interest should be granted only from the time the damages were liquidated by the district court in 1970. USP argues that interest should run from the various times that the reasonable royalties would have been paid in the years 1955–1958. The difference is substantial since the basic award, as modified, is $570,000, and the period of interest in dispute is asserted to be almost 15 years, at least for part of the sums due.

The relevant portion of 35 U.S.C. § 284 authorizes an award of damages to a "claimant," "together with interest and costs as fixed by the court." Prior to 1946, the statute did not specifically refer to interest. Act of Feb. 18, 1922, ch. 58, § 4921, 42 Stat. 392. In that year, the statute was amended. The major change was to eliminate the recovery of an infringer's profit as such and to allow recovery of the claimant's damages

willing to pay one-half of expected net profits (on the trial court's finding of GP's expected profit, this would amount to $25 per thousand square feet).

5. As Judge Learned Hand put it:
The whole notion of a reasonable royalty is a device in aid of justice, by which that which is really incalculable shall be approximated, rather than that the patentee, who has suffered an indubitable wrong, shall be dismissed with empty hands.
Cincinnati Car Co. v. New York Rapid Transit Corp., 66 F.2d 592, 595 (2d Cir. 1933).

only.[6] Along with that change, language as to interest was inserted in approximately its present form. USP contends that the purpose of the amendment vis-a-vis interest was stated in a 1946 House Report:

> The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages that complainant can prove, not less than a reasonable royalty, *together with interest from the time the infringement occurred.* * * * [Emphasis added.]

H.R. Rep. No. 1587, 79th Cong., 2d Sess. (1946). GP counters that the House version of the bill was not accepted and the amended bill used the language "together with such * * * interest, as may be fixed by the court."[7] The effect of the legislative history[8] on this issue was succinctly stated in General Electric Co. v. Sciaky Brothers, 415 F.2d 1068, 1077 (6th Cir. 1968), where appellant claimed that the district court erred in

allowing interest only from the date of a master's report:

> We note of course, that on the interest issue, both House and Senate reports on prior versions of 35 U.S.C. § 284 did contain language which could have been construed as a mandate to the District Court to award interest back to the date of infringement. Whatever prior versions of the bill or earlier committee reports may have stated, however, the critical fact is that the bill was amended so as to delete the reference to "interest from the time the infringement occurred." Under these circumstances, we do not see how we can say that the * * * District Judge erred as a matter of law * * *.

 Thus, whatever we might otherwise feel about the efficacy of the rule suggested by USP,[9] we agree with GP that Congress did not purport to require interest from the dates on which royalties would normally have been paid. But the next step in GP's reasoning, that

---

6. The distinction between a claimant's "damages" and an infringer's "profits" as terms of art is thoroughly discussed in Judge Herlands' opinion that held that GP's profits were not the proper measure of recovery and that USP's damages should be computed on the basis of a reasonable royalty. 243 F.Supp. 500 (S.D.N.Y.1965).

7. USP argues that the language of the House Report was nevertheless given sanction by the Supreme Court when it was cited in Aro Mfg. Co. v. Convertible Top Replacement Co., 377 U.S. 476, 505–506, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964). The sole purpose of the citation was, however, to support the proposition that "[t]he purpose of the change was precisely to eliminate the recovery of profits as such and allow recovery of damages," *id.* 505, 84 S.Ct. 1542, and we do not find the case controlling as to the interest issue before us. But cf. Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 386 F.2d 287, 290 & n. 3 (4th Cir. 1967) (semble), cert. denied, 390 U.S. 1030, 88 S.Ct. 1409, 20 L.Ed.2d 286 (1968).

8. GP also argues that the same scenario took place with respect to the 1952

codification of the patent laws. It correctly states that the House initially proffered "interest from the beginning of the infringement complained of * * *." H. R. 9133, 81st Cong., 2d Sess. (1950). But H.R. 9133 was replaced by other bills which included language similar to the provision adopted in 1946. Moreover, the legislative history concerning the House bill that was ultimately passed expressly disclaimed any attempt to make substantive changes in the law:

> [I]t was decided not to include most of the proposed changes in a bill but to defer them for later consideration, and to limit the bill to the main purpose of codification and enactment of title 35 into law, with only some minor procedural and other changes deemed substantially noncontroversial and desirable.

H.R.Rep. No. 1923, 82d Cong., 2d Sess. (1952). Thus, the failure to change the interest language in 1952 is not probative as to congressional intent with respect to the issue before us.

9. See Note, Recovery in Patent Infringement Suits, 60 Colum.L.Rev. 84, 854–55 (1960).

Congress intended no change whatsoever in the existing law respecting interest, does not necessarily follow. GP argues, in effect, that the deletion of the House language reinforced the hoary interest rule stated in Duplate Corp. v. Triplex Safety Glass Co., 298 U.S. 448, 459, 56 S.Ct. 792, 797, 80 L.Ed. 1274 (1936): "[W]e think that interest should run from the date when the damages are liquidated, and not, as by the present decree, from the date of the last infringement." Such a reading of Congress's failure to enact the House language has an initial appeal and there have been several post-1946 cases which have continued to apply the *Duplate* rule. See Wm. Bros. Boiler & Manufacturing Co. v. Gibson-Stewart Co., 312 F.2d 385, 387 (6th Cir. 1963); Union Carbide Corp. v. Graver Tank & Mfg. Co., 282 F.2d 653, 677 (7th Cir. 1960), cert. denied, 365 U.S. 812, 81 S.Ct. 692, 5 L.Ed.2d 691 (1961); Randolph Laboratories, Inc. v. Specialties Development Corp., 213 F.2d 873, 875 (3d Cir.), cert. denied, 348 U.S. 861, 75 S.Ct. 91, 99 L.Ed. 678 (1954). But cf. *Marvel Specialty, supra* note 7. However, in none of the cases applying the old rule did the court address itself to the effect of the new statutory language. Moreover, accepting GP's view fails to give sufficient weight to the specific language which the final bill did add: "interest * * * as fixed by the court." We agree instead with the position taken in *Sciaky, supra*, 415 F.2d at 1077, that "the statutory provision for * * * interest

* * * [is] made discretionary with the District Judge." Although the question is not free from doubt, we believe that the change in the statute was intended to grant the trial court its traditional discretionary power in equity,[10] which would allow Judge Tenney to go as far as he did. See C. McCormick, Damages § 59 (1935).

Once it is established that the district judge had the power to award interest from the date of last infringement, we think it clear that doing so in this case was no abuse of discretion. GP deliberately duplicated Weldtex and put itself in direct competition with USP in spite of its own counsel's warning that an expensive suit was inevitable. Moreover, since USP is recovering here only a reasonable royalty, GP is able in theory to retain the same profit it would have earned for the infringing period as a licensee. Since it has had the use of the money representing the reasonable royalty that it has not paid, interest at least from the date of last infringement is hardly unreasonable. Indeed, USP has a persuasive argument that the equities require GP to pay interest from the dates on which royalties would have been paid. But we have held, *supra*, that section 284 did not require that result, and whether the district court had the power in its discretion to reach it we leave for another day.[11]

Accordingly, the award is reduced to $570,000, with interest, as the district court ruled, from the date of last infringement.

---

10. In Merrell Soule Co. v. Powdered Milk Co., 7 F.2d 297, 300 (2d Cir. 1925), we characterized a reasonable royalty as "damages recovered and recoverable in equity."

11. In light of our holding, we find it unnecessary to consider USP's argument that interest from the date of last infringement was proper because the case comes within the "exceptional circumstances" exception to the *Duplate* rule. 298 U.S. at 459, 56 S.Ct. 792. Moreover, this argument was apparently not made below and no finding was made.