**HUGHES TOOL COMPANY, Appellee, Cross-Appellant,**

v.

**DRESSER INDUSTRIES, INC., Appellant, Cross-Appellee.**

**Appeal Nos. 85-2471, 85-2502.**

United States Court of Appeals, Federal Circuit.

April 13, 1987.

John F. Lynch, Arnold, White & Durkee, of Houston, Tex., argued for appellant, cross-appellee. With him on the brief were Michael O. Sutton and Donald J. Aspelund. Also on the brief were M. Scott Nickson, Jr. and Edward G. Fiorito, Dresser Industries, Inc., of Dallas, Tex., of counsel.

Britton A. Davis, Haight, Hofeldt, Davis & Jambor, Chicago, Ill., argued for appellee, cross-appellant. With him on the brief were Edward A. Haight and Dorsey L. Baker. Also on the brief was Robert A. Felsman, Felsman, Bradley & Gunter, of Fort Worth, Tex.

Before FRIEDMAN, RICH, Circuit Judges, COWEN, BENNETT,* Senior Circuit Judges, and NIES, Circuit Judge.

RICH, Circuit Judge.

This appeal is from the final amended judgment of March 11, 1985, of the United States District Court for the Northern District of Texas, Mahon, Judge, holding Hughes Tool Company's (Hughes Tool) U.S. Patent No. 3,397,928 ('928 patent)[1] valid and infringed by Dresser Industries, Inc. (Dresser), awarding damages in the amount of $132,096,430.92, and from orders denying various Dresser post-trial motions to reopen the record, amend the judgment, and for a new trial. We affirm in part, vacate in part, and remand.

## I. Background

The '928 patent claims in suit are directed to combinations of elements in a rock bit used in drilling oil and gas wells. Those combinations involve the use of a packing or seal of the O-ring type in the enclosed journal bearings of the rock bit cutters, wherein the O-ring is compressed by not less than 10% and preferably 15% of the thickness of the O-ring prior to its assembly.

### A. Rock Bits

The first rolling cutter rock bit was invented in 1909 by Howard Hughes, Sr. The modern rock bit, the product of technical improvements made over the last seventy-five years to Mr. Hughes' original, is a sophisticated piece of machinery costing up to several thousand dollars apiece. A rock bit, generally, is comprised of a supporting body structure or "head" to be threaded onto the lower end of a string of drill pipe, and carries three rotatable, generally conical cutters having either steel teeth or tungsten carbide insert ("TCI") cutting elements. These conical cutters turn on internal bearings and are mounted on three shafts or axles on the head.

In drilling wells using rock bits, the drill pipe with the rock bit attached is lowered, section by section, into the drill hole and rotated under the great weight of the string against the bottom. This causes the bit to work against the rock formation, chipping or crushing the rock as the cones drag and roll upon the bottom of the hole. A drilling fluid, usually water or a thin mud, is pumped downward through the pipe, and emerges from nozzles in the bit, picking up cuttings loosened at the bottom of the hole. The cuttings are carried upward from under the bit outside the pipe to the surface.

Much of the time and expense of rotary drilling is spent in the process of "tripping" —removing a spent bit from the end of a drill pipe at the bottom of the hole and replacing it with a new one. When a rock bit fails, as it inevitably will, the drilling crew must raise the drill stem, uncouple and stack the ninety-foot pipe sections one at a time, substitute a new bit, then recou-

---

* The Honorable Marion T. Bennett assumed senior status on March 1, 1986.

1. Cases involving this patent have been decided by this court on two previous occasions. See *Smith International, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 219 USPQ 686 (Fed.Cir.1983) (ordering the District Court for the Central District of California to issue an injunction) and 759 F.2d 1572, 225 USPQ 889 (Fed.Cir.1985) (an appeal challenging orders of the same court passing on various motions of Smith and Hughes). A third appeal in that case with respect to the damage award was argued Dec. 1, 1986.

ple and lower the pipe into the hole and resume drilling. In drilling wells of several thousand feet and more, the trip time required to change a bit may take up to ten or twelve hours, during which time no drilling gets done and injuries to the crew and other catastrophes such as blow-outs and well fires are most apt to occur.

The goal of rock bit engineers has thus been to increase the useful drilling life of the bit. There have been two primary approaches to solving that problem: improving the effectiveness and durability of the teeth or cutters, and prolonging the life of the bearings on which the cutters turn. Failure of either necessitates a "trip." This case relates to bearings.

### B. *Bearings*

The '928 patent is directed to solving the bearing portion of the rock bit design problem. The '928 patent discloses a design providing a bearing capacity which could outlast the life of the cutters.

Historically, there have been two main classes of bearings involved in rock bit technology: "journal" or "friction" bearings and "anti-friction" bearings which contain roller and possibly also ball bearings. Journal bearings are the simplest and sturdier form. The first rolling cutter rock bits dating from 1909 utilized journal bearings which were unsealed against grease loss and the intrusion of abrasive drilling fluid. The bearing was lubricated by a long lubricator sub-assembly from which grease flowed downward into the bearings and outward from the bottom of the bit. Various attempts were made during the early years to seal the journal bearings of Mr. Hughes' original design. While a sealed bearing would have prevented the drilling fluid from entering the bearing and retained the lubricating grease in the bearing, none of the early attempts to seal journal bearings succeeded.

Due to the perceived inability to seal them, journal bearings were abandoned in the early 1930's in favor of anti-friction roller bearings, which were better able to withstand the severe drilling environment without being sealed. In the original roller bearing bits, the drilling fluid was permitted to circulate through the roller bearings, a process known as "slush lubrication." The roller bearing bit soon became the standard in the industry.

### C. *Seals*

There were many problems in designing a sealed bearing rock bit, because of the severe conditions in which such bits operate—the very limited space available in a rock bit, the extreme weight and high temperatures at the bottom of the drill hole, and the rapid and peculiar movements of the cutters and shafts of the bits when slightly worn. An effective seal would have to possess both the resiliency to follow the erratic movements of the cutters but also be able to maintain an effective seal against changes in relative hydraulic pressures of the grease and drilling fluid.

Although the first patents disclosing sealed bearings were issued as early as 1918, it was not until the late 1950's that the first successful sealed-bearing rock bits were developed. Those first commercially successful sealed bearing rock bits utilized the then conventional roller bearings, an internal supply of grease, and the so-called "Belleville" seal, disclosed in Hughes Tool's Atkinson et al. U.S. Patent No. 3,075,781. The Belleville seal makes use of a saucer-shaped, annular, steel spring covered with rubber or plastic that surrounds the bearing shaft, providing continuous pressure against the opposed sealing surfaces of the head and cutter throughout the compound movements of the cutters during operation of the bit.

Although the Belleville-sealed bearing bits increased bit life dramatically, rock bit design engineers continued to work on improving bearing performance, hoping to design a bearing that would outlast the useful life of the cutters. Although synthetic rubber O-ring seals, which had developed rapidly in the World War II period, were known to be effective seals in other industrial applications, they were usually recommended for use only when the bearing surfaces to be sealed were free of abrasive substances and where movements such as

wobbling between the parts to be sealed would be small.

O-rings had been used as seals in rock-bit bearings before the present invention. Neilson U.S. Patent No. 3,127,942, issued in April, 1964 (Neilson patent) discloses a roller-bearing bit having an O-ring seal. Both U.S. Patent No. 2,075,997, issued to Clarence Reed in 1935 (Reed patent) and U.S. Patent No. 2,814,461, issued in 1957 to William Green (Green patent) relate specifically to a packing ring in a journal bearing bit. Green discloses the placement of a squeezed "packing ring" or "sealing gasket" (neither shown as nor stated to be O-rings) on the bearing shaft and between the opposing head and cutter surfaces, while Reed shows a packing ring similarly positioned that "would be compressed when placed in position."

### D. *The Squeeze*

Although Dresser, Smith International, and other competitors as well as Hughes Tool experimented with O-ring seals in the 1950's and early 1960's, none of these efforts was successful. The first successful O-ring seal in a rock bit was developed at Hughes Tool by Edward M. Galle, patentee of the '928 patent. Although Galle was not the first to make use of an O-ring seal in a rock bit, the primary distinction between the Galle invention and the work of his predecessors was the amount of cross-sectional "interference" or "squeeze" imparted to the O-ring in Galle's rock bit journal bearing design.

Although it was understood that relatively high-speed *rotary* operations, such as those involved in rock bit drilling, called for a small amount of squeeze, the '928 patent teaches a squeeze of "not less than substantially ten percent" and perferably not less than fifteen percent of the cross-sectional thickness of the O-ring in its relaxed condition. This is considerably higher than the amount of squeeze recommended by manufacturers of O-rings. Such amounts of squeeze were believed to increase friction and overheat the O-rings, thus decreasing their life span. The '928 patent disclosed that the heat generated by such large interferences apparently "dissipates in the drilling fluid that turbulently flows around the drill bit."

### E. *Hughes Tool's New Rock Bits*

Hughes Tool introduced new rock bits embodying the seal invention of the '928 patent with journal bearings in 1969. The new bits were very successful, demonstrating a capacity to endure for extremely long runs, on the order of 100 hours or more, which was double or triple the performance of the old slush-lubricated roller bits. The new sealed journal bearing bits were particularly successful because they unlocked the full potential of the TCI cutting structures, which typically had outlasted the bearings.

Hughes Tool's competitors reacted immediately to the introduction of the new bits, commencing research projects to develop competitive bits. Although the engineers at Hughes Tool's main competitors, Dresser and Smith International, Inc., were skeptical of the teachings of the '928 patent and particularly of the usefulness of O-rings in a bearing seal, both companies ultimately decided to copy the O-ring seal of the '928 patent and began selling rock bits that included Hughes Tool's patented O-ring seal. Over $3.5 billion worth of the new sealed journal bearing rock bits were ultimately sold by Hughes Tool and its competitors. Dresser's total sales of such rock bits in the years 1973 through 1982 amounted to $343,354,994.00.

### II. *The Present Action*

Hughes Tool originally filed this action against Dresser in 1976, alleging infringement of its '928 patent as well as U.S. Patent Nos. 3,476,195 ('195 patent) and reissue patent Re. 28,625. The reissue patent was dismissed from the suit voluntarily before trial in a consent judgment of invalidity.

On July 11, 1980, the district court granted Dresser's motion for summary judgment, dismissing this action on collateral estoppel grounds, after both the '928 and the '195 patents were held invalid for obviousness by the United States District Court

for the Middle District of California in an earlier-filed suit between Hughes Tool and Smith International. On appeal, the Court of Appeals for the Ninth Circuit reversed the holding of invalidity of both the '928 and '195 patents, holding that Smith had not sustained its burden of showing invalidity. *Smith International, Inc. v. Hughes Tool Co.*, 664 F.2d 1373, 215 USPQ 592 (9th Cir.), *cert. denied*, 456 U.S. 976, 102 S.Ct. 2242, 72 L.Ed.2d 851 (1982).

The present case was thereupon reactivated in May, 1982. Following a bench trial in February, 1983, the district court entered a Memorandum Opinion and Order on February 6, 1984, finding the '928 patent valid and infringed, but finding the '195 patent invalid.

Dresser filed post-trial motions under Fed.R.Civ.P. 59, asking for a new trial on the grounds of newly discovered evidence regarding the validity of the '928 patent as well as the size of the damage award. Those motions were denied by the district court.

Dresser has appealed the district court's holding of validity of the '928 patent and the amount of damages awarded to Hughes Tool for the infringement. Dresser also appeals the court's denial of its post-trial motions. Hughes Tool does not appeal the district court's holding that the '195 patent is invalid, but cross appeals on two issues relating to the sufficiency of the damage award for the infringement of the '928 patent.

### III. *The Decision Below*

The lower court opinion being unreported, we will summarize briefly its major findings and conclusions with the general preliminary comment that the court was thorough, fair, and comprehensive in its analysis. It wrote 42 pages exclusive of formal findings and conclusions which occupy an additional 22 pages.

### A. *Validity*

The district court, in its extensive memorandum opinion, began its analysis by noting that the '928 patent "involves an O-ring or packing ring positioned in a groove, thus forming a seal for a rock bit." The court noted that claim 1 calls for the O-ring to be "compressed by not less than substantially ten percent of its thickness prior to assembly."

The court then turned to an examination of the scope and content of the prior art and a comparison of the differences between the prior art and the claims at issue, finding that the prior art revealed all of the elements of the '928 patent except the requirement of a squeeze of "not less than substantially 10%." Although Dresser submitted evidence of articles and catalogs showing that squeezes of more than 10% were commonly used for slow rotary speed seals, the court found that rock bit bearings are run under high speed and high temperature rotary conditions. The court also noted that "[w]ithout exception, the catalogs recommended higher squeezes for slow rotary speeds and lower squeezes for fast rotary speeds." The court thus concluded that rock bit engineers in the 1960's would have consulted the charts for fast rotary speeds and would have concluded that squeezes well below 10% were proper for O-ring bearing seals in rock bits. The court also noted in conclusion that the prior art would probably have discouraged rock bit engineers from considering the use of O-rings as bearing seals because of the abrasive conditions and the heat, pressure, and friction encountered at the bottom of the drill hole. The court thus found that the inventor, Galle, proceeded "contrary to the accepted wisdom of the art" by using an O-ring seal in a rock bit and by requiring a minimum of a 10% squeeze.

With respect to the criticality of the minimum 10% squeeze, the district court found that the successful results of the greater squeeze were unexpected and "contrary to the thinking of rock bit engineers in the 1960's." Moreover, the criticality was substantiated by the fact that the minimum 10% squeeze was the one factor that both Hughes and all of its competitors found to be essential to a longer-life bit. The court concluded that there was "ample evidence showing the criticality" of the minimum 10% squeeze.

The court also discussed evidence of the skepticism of the experts at both Smith International and Dresser, the overwhelming commercial success of Hughes Tool's new rock bits, and the fact that both Dresser and Smith International chose to copy the patented feature of the new bits. The court then concluded that the evidence "clearly establishe[d] that the use of an O-ring with a minimum of a 10% squeeze in a rock bit would not have been obvious to a person having ordinary skill in the art...."

## B. *Damages*

Although Hughes Tool sought damages based on its lost profits with respect to the TCI journal bearing bits Dresser sold to customers within the United States, the court concluded that Hughes Tool "failed to demonstrate with 'reasonable probability' an approximation of the profits it would have made on the infringing Dresser sales." The court then set out to determine, "under the 'willing buyer—willing seller' rule, what a reasonable royalty" would have been.

In assessing the evidence on the damages issue, the district court found that customer demand for the patented rock bits was strong and that no acceptable non-infringing alternative existed. However, the court also found that Hughes Tool failed to demonstrate the manufacturing and marketing ability to meet the demand for at least part of the period of Dresser's infringement.

Turning specifically to the commercial situation as it existed in 1973, the district court noted that Hughes Tool was experiencing a rising demand for its patented journal bearing bits and that Hughes Tool believed that those bits were more profitable than its sales of certain other tools. Although Hughes Tool had a company policy of not licensing its patented inventions to major competitors, the court did note evidence of forty-five prior licenses and offers of licenses under other patents owned by Hughes Tool at royalty rates of six percent or less. The court did not give much weight to those prior royalty rates, however, because those licenses were for

widely diverse products. Similarly, the court acknowledged the existence of one license at four percent to a non-competitor, Gault, and specifically held that it would not consider a fifteen percent license agreement made in 1983 in settlement of litigation with Hughes Tool's competitor, Rock Bit Industries. The court ultimately concluded that Hughes Tool showed no desire to license direct competitors under the '928 patent.

The court also found that Dresser was concerned about a potential loss of fifty to sixty percent of its rock bit market to Hughes Tool; that when Dresser considered beginning to manufacture the patented journal bearing bits itself in 1973, it projected total profits of 60% on sales of the new bits; and that its total profits on all sales the year before had been 7.2%. The district court also noted that Hughes Tool asserted profits of 49–54% on sales of the patented journal bearing insert bits.

The district court found, however, that Hughes Tool did not realize that the demand for rock bits other than sealed journal bearing bits would drop as sharply as it did. In addition, Hughes Tool was aware that its competitors were working diligently to produce competitive rock bits. Finally, the district court found that the '928 patent did not give the new rock bits their essential market value, but rather that the patented O-ring seal was only one of numerous parts that contributed to the overall value of the rock bit.

Although Hughes Tool's expert at trial asserted that 52.8% was a reasonable royalty for both the patents in suit, that assertion was based on the assumption that the patented combination with the O-ring seal was responsible for most of the value of the bit. The district court disagreed, stating that the '928 patent contributed only part of the total value of the bit, and concluded that 25% of the gross sales price would have been a reasonable royalty had the parties negotiated for a license in 1973.

The district court went on to find that a ten percent interest rate was appropriate for awarding prejudgment interest. The court declined to increase the damages,

finding that Dresser did not willfully infringe the '928 patent. Although Dresser "deliberately copied the ideas and designs in the '928 patent," the court found that Dresser did so only after a reasonable investigation into the scope of the patent and a good faith belief that the patent was invalid.

In its amended judgment of March 11, 1985, the district court awarded damages in the amount of $132,096,430.92 to Hughes Tool. That amount included prejudgment interest of $29,439,158.91.

The court did not award prejudgment interest for the period between November 30, 1979 and February 22, 1982, when the '928 patent "was considered invalid and unenforceable by the California federal court." That was the period between the district court holding of invalidity in the *Smith* suit and its reversal by the Ninth Circuit Court of Appeals.

The court held further hearings on February 15, 1985 and March 1, 1985, on Dresser's motions to reopen the record, to alter or amend the judgment, and for a new trial. After stating that it did not find the allegedly newly discovered evidence warranted reopening of the case or a reduction in the damages award, the court denied Dresser's motions in an order dated May 2, 1985.

On May 31, 1985, Dresser appealed the district court's judgment with respect to the validity of the '928 patent and the amount of damages, as well as the district court's denial of its post-trial motions. Hughes Tool filed its cross-appeal on June 13, 1985, seeking review of the district court's failure to award increased damages as well as its failure to award prejudgment interest for the period the '928 patent had temporarily been under the cloud of a district court holding of invalidity.

### IV. *Opinion*

### A. *Validity*

The issue here is whether the district court erred in concluding that Dresser did not carry its burden of proving that the invention claimed in the '928 patent, as a whole, would have been obvious to one of ordinary skill in the art at the time the invention was made.

Under 35 U.S.C. § 282 the '928 patent is presumed valid. That presumption places the burden of establishing invalidity on the attacker, Dresser. It is for the district court to determine whether the attacker has carried the burden. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984). The attacker must provide clear and convincing evidence of the facts leading to the conclusion of invalidity of the claims at issue in order to carry that burden. *Lindemann Maschinenfabrik GMBH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459, 221 USPQ 481, 486 (Fed.Cir.1984).

After considering all of the evidence before it, including prior art before the Patent and Trademark Office (PTO) during prosecution as well as evidence that was not before the PTO, the district court concluded that the evidence did not support Dresser's assertion that the prior art would have suggested a minimum 10% squeeze of O-rings used to seal rock bit bearings. Dresser's evidence included catalogs and articles which suggested that a squeeze of greater than 10% would be appropriate for low speed rotary applications. However, the evidence before the court also indicated that the sliding velocity on the surface seal of a rock bit bearing is as high as 540 feet per minute, a concededly "high" rotary speed. The district court thus properly found that rock bits are sometimes run at high speeds and that rock bit engineers in the 1960's would have designed the bits for high speed rotary operations, thus leading them to conclude that squeezes well below 10% would have been appropriate.

Dresser also challenges the district court's finding that a squeeze of not less than 10% is "critical," arguing that the burden should have been on Hughes Tool to establish the criticality of that claim limitation. Although the district court expressed "concern" over the evidence of criticality before the PTO, the presumption of

validity placed the burden of establishing non-criticality on Dresser. Dresser has not pointed to any evidence tending to show that the minimum of 10% squeeze was *not* critical. We are not persuaded that the district court was clearly erroneous in concluding that Dresser had not carried its burden of persuasion on the criticality issue. If it was not critical to success, why was it copied?

Finally, Dresser argues that the district court erred by considering objective indicia of nonobviousness (the so-called "secondary considerations"), namely, evidence of skepticism of experts, long-felt need, commercial success, and copying. Dresser conceded that rock bits embodying the features claimed in the '928 patent attained enormous commercial success and satisfied a long-felt need. Dresser also conceded that while its engineers were initially skeptical, it eventually copied the patented features of Hughes Tool's new rock bits, including the amount of squeeze imparted to the O-ring seal. The district court noted that, despite Dresser's assertions that other aspects of Hughes Tool's new rock bits were responsible for Hughes Tool's commercial success, the one feature that Hughes Tool and all of its competitors continued to use was the minimum 10% squeeze called for in the claims in suit of the '928 patent. Such continuous use of the patented feature while other features were not copied gives rise to an inference that there is a nexus between the patented feature and the commercial success. We are not persuaded that the district court erred in concluding that there was such a nexus in this case.

We conclude, on the record before us, that the district court properly held that Dresser failed to carry its burden of proving that the '928 patent is invalid for obviousness of the claimed invention.

Dresser has not denied its infringement of the '928 patent. Thus the only issues

remaining on appeal and cross-appeal are those pertaining to the amount of the damage award.

## B. *Damages*

◼ The district court's award of damages to Hughes calculated as a royalty of 25% of the dollar amount of Dresser's total sales of certain infringing bits is based on a finding of fact with respect to Dresser's projected profits which Dresser asserts is clearly erroneous.[2] The basic predicate for the district court's 25% royalty determination is that Dresser projected "total profits of 60% as a percent of sales (PX 82, 93, Response to Request for Admission 11)." That 60% "profit" figure was then contrasted with Dresser's 1972 actual profits of 7.2% for all of its sales. (PX 82, Response to Request for Admission 16.) The 60% profit projection is referenced repeatedly in the court's analysis and is clearly critical to its damage award:

"... the projection of 60% profit in the present case, admitted by Dresser"

"Hughes's 49% and 54% royalty requests would be 81.6% and 90% of Dresser's projected 60% profits in this case."

"15% profit" in other Hughes litigation is "considerably lower profit than those projected in the present case."

"the parties in 1973 projecting 49% [Hughes] to 60% [Dresser] profits."

"Dresser projected 60% profits on the sale of bits with the '928 seal."

"Hughes suggests it realized profits of 49% and 54% on its '928 bits sold in the United States and abroad."

"This figure [25% of sales price] would still have allowed Dresser to realize a large profit on its sales of the bits."

"Of these various considerations [relevant to setting a reasonable royalty] the expected profit from making and selling the patented invention is the primary consideration."

---

2. A 5% royalty was awarded on infringing steel tooth bits; 25% on the premium insert journal bits. The 5% figure is not challenged on appeal. The difference in these royalties apparently resulted from the district court's assessment that 5% and 25%, respectively, were the contribu-

tions of the invention to "the value of the bits." There is, however, no direct evidence on this point, or evidence from which a reasonable inference of 5% and 25% respectively might be drawn.

Before this court Hughes Tool argues: "The magnitude of this 'large profit' of 60% less the royalty award of 25%, left Dresser a 35% profit from sales—as contrasted with its usual profit of 7.2% of sales on all of its products." Hughes's simple arithmetic, however, is a gross distortion of reality.

The evidence of Dresser's projected profitability does not show, as the trial court found and Hughes asserts here, that, in 1973, Dresser was projecting 60% profit on the proposed new product line. Rather, Dresser's projection was a 60% return on the additional investment required to make the bits. Thus, the 60% projection of such return cannot be compared meaningfully with the 7.2% *actual* profits of 1972.

The evidence on this point from PX 82 and PX 93 on which the district court relied for its finding is set forth below in pertinent part. In Requests for Admissions propounded to Dresser (PX 82) the following pertinent requests were made and answered:

*REQUEST NO. 11* [by Hughes]

During the year 1973, defendant, Dresser Industries, anticipated that its incremental future sales of Insert Rock Bits with Journal Bearings would provide defendant with profits, on an earnings before tax basis, of not less than 60% of dollar sales of such Rock Bits.

*RESPONSE TO REQUEST NO. 11* [by Dresser]

*Denied.* During the year 1973, *for the purposes of capital appropriations only,* personnel of Defendant at one time forecast that its incremental future sales ascribable to that particular appropriation request of insert Rock Bits with Journal Bearings would provide Defendant with profits, on an earnings before tax basis, of not less than 60% of dollar sales of such Rock Bits. [Emphasis ours.]

*REQUEST NO. 16* [by Hughes]

During its fiscal years 1972 through 1981, defendant, Dresser Industries, was making profits, on a before tax basis, as a percentage of net dollar sales of all of its products and services as set forth below:

| YEAR | PROFIT AS % OF NET DOLLAR SALES | NET DOLLAR SALES (MILLIONS) |
|------|--------------------------------|------------------------------|
| 1972 | 7.2 | 906.2 |
| 1973 | 7.1 | 1,025.2 |
| 1974 | 8.2 | 1,398.0 |
| 1975 | 11.2 | 2,011.6 |
| 1976 | 12.2 | 2,232.2 |
| 1977 | 13.2 | 2,538.8 |
| 1978 | 12.4 | 3,054.0 |
| 1979 | 11.8 | 3,457.4 |
| 1980 | 11.2 | 4,016.3 |
| 1981 | 11.5 | 4,614.5 |

*RESPONSE TO REQUEST NO. 16* [by Dresser]

Admitted.

The documentary evidence (PX 93) which supports the answer to Interrogatory 11 is a 1973 internal Dresser report entitled "CAPITAL REQUIREMENTS FOR COST REDUCTION & EXPANSION OF OIL-FIELD & MINING PRODUCTS." Page 1 of this document follows:

PROJECT SUMMARY

Approval is requested for an investment of $4.6MM in new equipment for our Division's rock bit manufacturing plants. The projected return on investment is 60.1%

This investment is required for two distinct reasons:

—*Expansion*

Equipment investment $2.8MM—R.O.I. 67.1%

To expand productive capability to meet current and projected Marketing demand for sealed bearing bits, blasthole bits, and drilling tool cutters.

*—Quality and Cost*

Equipment investment $1.8MM—R.O.I. 27.4%

To replace existing old equipment with modern, high precision machine tools in order to meet the exacting specifications of today's high-technology bits and thereby establish a uniform quality level of our products.

To reduce variable production cost, curtail work-in-process inventories and lead-time, and retain and enhance our position as low cost producer in the industry.

The project is split into three separate appropriation requests, each one of which is an integrated package:

AR 73–124A—Illinois Avenue Expansion

AR 73–124B—Manchester Expansion

AR 73–124C—Illinois Avenue Cost Reduction

The machine tools requested in each individual A.R. are complementary in the production process. Segregation of individual tools out of an A.R. will seriously impair the meeting of the objectives set forth.

New investment in buildings or land is *not* required.

The testimony of Dresser's controller, Mr. Munnerlyn, and Hughes Tool's Chief Accounting Officer, Mr. Willis, is consistent with the above evidence that the expected profit on incremental sales would yield a 60% return on incremental investment. There is no evidence to the contrary.[3]

Thus, this case closely parallels *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295, 170 USPQ 369 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). The ques-

tion in *Georgia Pacific* was the reasonableness of a royalty of $50 per thousand square feet of 'certain plywood sales. There, the district court (as did the district court here) accepted that a reasonable royalty must be fixed so as to leave the infringer a reasonable profit. *Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1122, 166 USPQ 235, 239 (S.D.N.Y.1970). To calculate the royalty, the *Georgia Pacific* trial court erroneously used a figure of $159.41, which represented Georgia Pacific's average "realization" on plywood sales [possibly margin], rather than a figure of $50.00, which represented Georgia Pacific's expected profit on such sales. Thus, the award of a $50.00 royalty, which would leave no profit, was set aside on appeal as excessive. 446 F.2d at 299, 170 USPQ at 372.

The royalty of 25% set in this case, being based on a clearly erroneous finding of projected profits of 60% as a percent of sales, is *ipso facto* arbitrary and must be set aside.

### C. *Prejudgment Interest*

An award of prejudgment interest to a patent owner for the period during which his patent was declared invalid is appropriate if, after exercising its discretion, the district court decides that such an award is necessary to put the patent owner in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement when the infringement began. The district court here decided not to award prejudgment interest for the time during which the '928 patent was considered invalid and unenforceable. The court's decision must be reviewed for abuse of discretion. But to the extent that decision was based on the misunderstanding that prejudgment interest can never be awarded in such a circumstance, it is contrary to law and should be reconsidered on remand. *See General Motors Corp. v. De-*

---

**3.** The dissent says the majority apparently views PX 93 and Interrogatory 11 as inconsistent. The two exhibits are consistent and support each other. The dissent simply misreads the answer to Interrogatory 11, ignoring the significant words "for purposes of capital appropria-

tions only." The dissent also omits the part of Mr. Munnerlyn's testimony which explains that he was justifying an appropriation request and that the projection was "way over-stated" as an actual projected profit figure.

*vex Corp.*, 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983).

Lastly, we affirm the trial court's May 2, 1985, denial of Dresser's post-trial motions.

### Conclusions

The judgment of the district court with respect to validity is *affirmed*. The judgment on damages is *vacated* and the case is *remanded* for a redetermination of damages based on a reasonable royalty computed in accordance with this opinion and a reconsideration of the amount of prejudgment interest.

### Dresser's Post-hearing Motion

On November 24, 1986, ten months after this case was heard, Dresser filed a Motion to Remand, to Vacate, or to Reopen the Record, or Obtain Relief from Judgment because of a document it became aware of contained in an appendix in a case, *Smith International, Inc. v. Hughes Tool Co.*, Nos. 86–1139, 86–1125, *see* note 1, supra, which was argued in this court in December of 1986. Dresser argues that this newly discovered evidence has a material effect on the validity of the '928 patent because it indicates that Hughes Tool was still searching, in 1974, for a bit that would operate efficiently at high RPM. Dresser asserts that this document was withheld. Hughes Tool retorts that it twice provided the document but that Dresser never requested that it be copied, and further that the document does not affect the outcome of this case. Given the factual disputes bound up with this motion, we cannot, as an appellate tribunal, pass on its merits and therefore deny Dresser's motion.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.**

FRIEDMAN, Circuit Judge (with whom BENNETT, Senior Circuit Judge, joins), dissenting in part.

I disagree with the court's holding that the district court's finding that Dresser projected a profit of 60 percent of its sales prices of certain bits is clearly erroneous. I also would hold that the district court improperly denied prejudgment interest for the period during which the '928 patent was considered invalid and unenforceable following the district court's decision so holding, which the Court of Appeals for the Ninth Circuit reversed more than two years later. In all other respects I agree with and join the court's opinion.

### I

In setting aside the finding that Dresser projected a profit of 60 percent of sales, the court refers to four items of evidence. The strongest is Hughes' request No. 11 for admission and Dresser's response:

REQUEST NO. 11

During the year 1973, defendant, Dresser Industries, anticipated that its incremental future sales of Insert Rock Bits with Journal Bearings would provide defendant with profits, on an earnings before tax basis, of not less than 60% of dollar sales of such Rock Bits.

RESPONSE TO REQUEST NO. 11

Denied. During the year 1973, for the purposes of capital appropriations only, personnel of Defendant at one time forecast that its incremental future sales ascribable to that particular appropriation request of insert Rock Bits with Journal Bearings would provide Defendant with profits, on an earnings before tax basis, of not less than 60% of dollar sales of such Rock Bits.

Although Dresser denied this request, the reason for the denial was not disagreement with the figure of "not less than 60% of dollar sales of such rock bits," but disagreement over whether during 1973 Dresser had "anticipated" such earnings, as the request stated. Dresser denied the request and set forth its position that during 1973 its personnel, "for purposes of capital appropriations only, ... at one time forecast that its incremental future sales ascribable to that particular appropriation request" would be "60% of dollar sales."

In other words, Dresser's disagreement was not with whether the percentage of dollar sales was 60 percent, but whether this profit was "anticipated" or merely

"forecast" by some of Dresser's personnel for the purpose of making capital appropriations. Dresser's response adopted Hughes' language that the earnings forecast by Dresser personnel on sales of "Insert Rock Bits with Journal Bearings [was] ... of not less than 60% of dollar sales of such Rock Bits."

The court also quotes from plaintiff's exhibit 93, a Dresser 1973 internal document which projected a 60.1 percent "return on investment" on recommended increases in plant and equipment to be used in manufacturing bits. The court apparently views PX 93 as inconsistent with the response to request No. 11, and therefore may have assumed that when Dresser stated in that response that it forecast earnings of "60% of dollar sales," it meant 60 percent "on" the additional "investment."

Even if this were the only evidence in the record, the court would not be justified in reversing the finding as clearly erroneous. Despite plaintiff's exhibit 93, Dresser's unequivocal admission that it forecast earnings of not less than 60 percent of "dollar sales," which it made in a carefully considered response to the request, justified the district court's acceptance of that figure. *See* Fed.R.Civ.P. 36(b). Furthermore, the unambiguous language of Dresser's response to request No. 11 is not the only evidence in the record that supports the 60 percent of dollar sales figure. In fact, testimony showed that Dresser's response in terms of a percentage of "dollar sales," rather than a percentage of such items as "capital appropriations" or "additional investment" was correct, not erroneous.

In its operations, one division of Dresser, "P & M Manufacturing" (P & M), manufactured the insert journal bearing bits, and another division, "Security," sold them. After P & M manufactured the bits, it "sold" them to Security at a fictitious price that included a "profit" for P & M based on the "sale" price less manufacturing costs (including materials and labor) and overhead allocation. Security sold the bits to customers, and a "profit" was attributed to Security based on the selling price less Security's purchase "cost" (from P & M)

and Security's own selling costs and overhead allocation. The overall profit to Dresser was the sum of the profits thus allocated to P & M and Security.

The 1973 internal appropriations request report (PX 93), upon which the majority relies, does state that 60.1 percent is the projected return on the investment of $4.6 million for new equipment for the rock bit manufacturing plants. However, further examination shows that the internal report covers capital appropriations involving the manufacture and sale of seven different bits, only one of which was the infringing insert friction bit at issue here. In discussing the report with respect to the sales projections for only the insert friction bit, Mr. Munnerlyn, Dresser's comptroller, stated that P & M was projected as manufacturing and selling 1,750 insert friction bits to Security for $908,000, on which P & M anticipated a profit of $89,000 (9.8 percent). Mr. Munnerlyn also testified that Security anticipated sales of the same bits for $2,713,000, of which $1,559,000 was expected profit. The following colloquy then occurred:

Q. And so, the total expected profit from the manufacture and sale by Dresser of insert journal bearing bits, in 1973, was 60 cents of each sales dollar, wasn't it?

A. If you add those two together, that's what you would get.

Q. Wasn't that the expected profit?

A. Yes.

Thus, the two divisions of Dresser projected a combined profit of $1,648,000 on annual sales of $2,713,000 for an anticipated profit of 60.7 percent relative to annual dollar sales, which is the figure admitted by Dresser in response to Request No. 11. (These estimated profits apparently did not include anything for "capital fee," but the appropriations report did take into account some allocations for "capacity costs.")

As the Supreme Court recently pointed out, the "clearly erroneous" standard in Federal Rule of Civil Procedure 52(a)

does not entitle a reviewing court to reverse the finding of the trier of fact

simply because it is convinced that it would have decided the case differently. The reviewing court oversteps the bounds of its duty under Rule 52(a) if it undertakes to duplicate the role of the lower court.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). The district court's finding in this case cannot be clearly erroneous.

## II

Although the district court noted in this case that "prejudgment interest should be awarded under 35 U.S.C. § 284 unless there is some justification for withholding such an award," the only explanation the court gave for its denial of prejudgment interest for the period from November 30, 1979 to February 22, 1982, was that the '928 patent "was considered invalid and unenforceable by the California federal court" (amended judgment, paragraph 5). The majority holds that this ruling was within the district court's discretion, "[b]ut to the extent that decision was based on the misunderstanding that prejudgment interest can never be awarded in such a circumstance, it is contrary to law and should be reconsidered on remand. *See General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 657, 103 S.Ct. 2058, 2063, 76 L.Ed.2d 211, 217 USPQ 1185, 1188 (1983)." For the following reasons, I cannot agree.

In the *General Motors* case, the Supreme Court stated that "[b]ecause we hold that prejudgment interest should ordinarily be awarded absent some justification for withholding such an award, a decision to award prejudgment interest will only be set aside if it constitutes an abuse of discretion." 461 U.S. at 657, 103 S.Ct. at 2063, 217 USPQ at 1189. I disagree with the court's ruling that a decision not to award prejudgment interest is reviewable only for an abuse of discretion. Where prejudgment interest is denied, a reviewing court must first determine if the justification the district court gave is sufficient as a matter of law to support the limitation or elimination of such interest, and then must further review the factual findings supporting the

justification to determine if they are clearly erroneous. *See Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp.,* 807 F.2d 964, 968, 1 USPQ2d 1191, 1194 (Fed.Cir. 1986). In my view, the district court in the present case was not warranted in denying prejudgment interest for the interim period that the patent was considered invalid.

Recently, this court in *Bio-Rad* reiterated its view "that a district court's justification for limiting prejudgment interest 'must have some relationship to the award of prejudgment interest.' " *Id.* at 967, 1 USPQ2d at 1193 (citing *Radio Steel & Mfg. Co. v. MTD Prod.,* 788 F.2d 1554, 1557–58, 229 USPQ 431, 434 (Fed.Cir.1986)). The purpose of awarding prejudgment interest is "to afford the plaintiff full compensation for the infringement." *General Motors,* 461 U.S. at 654, 103 S.Ct. at 2061, 217 USPQ at 1188. As the Supreme Court explained:

> In the typical case an award of prejudgment interest is necessary to ensure that the patent owner is placed in as good a position as he would have been in had the infringer entered into a reasonable royalty agreement. An award of interest from the time that the royalty payments would have been received merely serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment.

*Id.* at 655–56, 103 S.Ct. at 2062–63, 217 USPQ at 1188 (footnote omitted).

The district court awarded Hughes damages for the entire period of Dresser's infringement, including the period during which the '928 patent "was considered invalid and unenforceable by the California federal court." Since the purpose of prejudgment interest is to compensate the patentee for the "forgone use of the money between the time of infringement and the date of the judgment" that it would have received had the defendant entered into a royalty agreement instead of infringing, I think the prejudgment interest should cover the entire period of infringement, as the

damages do. The fact that during part of the time the patent was considered invalid does not constitute a sufficient "justification for withholding such an award" which, under the dictum in *General Motors,* may make it "appropriate not to award prejudgment interest." *Id.*

Accordingly, I would reverse the district court's denial of prejudgment interest for the period from November 30, 1979, to February 22, 1982. Since the district court has already exercised its discretion in setting the rate of prejudgment interest and the method of compounding, *see Bio-Rad,* 807 F.2d at 869, 1 USPQ2d at 1194–95 (and cases cited therein), a remand on the prejudgment interest is not necessary.