**BECTON DICKINSON AND COMPANY, Plaintiff,**

v.

**C.R. BARD, INC., Defendant.**

**Civ. A. No. 86–1684.**

United States District Court,
D. New Jersey.

July 28, 1989.

As Amended Sept. 21, 1989.

Elliot M. Olstein, John N. Bain, Michael S. Miller, Carella, Byrne, Bain & Gilfillan, Roseland, N.J., for plaintiff.

Frank L. Bate, Shanley & Fisher, Morristown, N.J., and John D. Foley, Warren H. Rotert, Christopher E. Chalsen, Karl M. Zielaznicki, Morgan & Finnegan, New York City, for defendant.

## OPINION

WOLIN, District Judge.

Plaintiff Becton Dickinson and Company ("Becton Dickinson" or "B–D") brings this patent infringement suit against defendant C.R. Bard, Inc. ("Bard") for alleged infringement of United States Patent No. 3,789,841 ("the '841 patent"). The subject matter of the '841 patent is a disposable guide wire used in the catheterization of blood vessels. Bard has moved for summary judgment on three grounds: (1) that the patent is unenforceable because of allegedly inequitable conduct on the part of B–D in the patent prosecution process; (2) that the patent is invalid for obviousness over the prior art pursuant to 35 U.S.C. § 103; and (3) that Bard has not infringed the patent as a matter of law. The Court will grant the motion.

## BACKGROUND

In 1953 Sven Ivar Seldinger first described an alternative to heart bypass surgery for the treatment of blocked coronary arteries. In performing a Seldinger technique, formally known as Percutaneous Transluminal Coronary Angioplasty (PTCA), a physician directs a guide wire into the occluded artery or arterial branch. The physician then directs a balloon catheter over the guide wire to the site of the blockage, withdraws the guide wire and expands the balloon in order to expand the artery. PTCA procedures have proven so effective that today over 160,000 such procedures are performed annually.[1]

In 1970 William T. Antoshkiw, a Becton Dickinson employee, developed a spring guide wire that he thought was an improvement over the prior art. Based upon an application filed on September 15, 1971, the Patent and Trademark Office granted the '841 patent to Antoshkiw as assignor to B–D on February 5, 1974. The disposable guide wire of the patent is depicted in Figures 1 and 2 of the patent, which are reprinted in Appendix A. The guide wire of the '841 patent comprises a stainless steel inner wire 10 having a portion 12 of uniform diameter and a gradually tapered portion 14. The portion of the core 12 having the uniform diameter is called the "proximal portion" and is enclosed and engaged by a plastic jacket 16; the tapered portion 14 of the core is called the "distal portion" and is covered by a coil spring 18. The terms "proximal" and "distal," as used in the prior art and in the '841 patent, refer to the physician during use, so that the proximal portion is closest to the physician

---

1. *See* Three Year Plan of USCI Division of C.R. Bard, Inc., April 1985, Olstein Affidavit Exh. 2, at 19.

(and furthest from the patient) during use and the distal portion is furthest from the physician (and closest to the patient) during use.

The patent recites that the steel spring enclosing the distal portion of the invention "provides flexibility and resiliency while permitting the introduction of the guide wire through a stainless steel cannula without the danger of skiving during introduction of the wire." At the same time, the patent purports to reduce the danger of spring breakage by shortening the spring and attaching it to the inner core at both ends. The use of a tapered core wire in the distal portion, according to the patent, provides for a uniform increase in flexibility from the proximal portion to the distal tip.

The patent cites several advantages of the use of a plastic jacket around the proximal portion of the center of the core wire, namely (1) reducing the length of spring coil required and thereby greatly reducing the cost of the guide wire; (2) providing a smooth, low friction surface and thereby easing the movement of the guide wire through a blood vessel; (3) providing an outer surface that is easier to clean than the spring coil; (4) preventing blood clotting between the coils of the spring; (5) providing support to the wire and therefore reducing the chance of wire breakage; (6) providing excellent torque transmission to the distal portion, thus facilitating manipulation of the guide wire; and (7) serving as an insulator and thus eliminating the electrical hazard present during the use of devices based on the prior art.

As the general advantages of the claimed invention, the patent lists the following: (1) disposability of the guide wire and the lack of a need to clean and sterilize it after each use; (2) maneuverability; (3) a low coefficient of friction; (4) good torque transmitting ability; (5) prevention of clot formation; and (6) low chance of breakage.

The claims of the patent are as follows:

1. A flexible guide wire, comprising:

an elongated inner core wire having a proximal portion and a distal portion;

a coil spring enclosing the distal portion and fixably attached thereto the coil spring including a proximal end and distal end; and

a plastic jacket enclosing and engaging the proximal portion the jacket including a proximal end and a distal end, the jacket distal end terminating at the coil spring proximal end and being substantially equal in diameter to the coil spring such that the jacket forms an extension of the coil spring.

2. A guide wire as described in claim 1, wherein the proximal portion is of uniform diameter.

3. A guide wire as described in claim 1, wherein the coil spring is attached to the inner core wire at both ends of the distal portion.

4. A guide wire as described in claim 1, wherein the inner core wire is made of stainless steel.

5. A guide wire as described in claim 1, wherein the coil spring is made of stainless steel.

6. A flexible guide wire, comprising:

an elongated inner core wire having a proximal portion and a tapered distal portion;

a coil spring enclosing the distal portion and fixably attached thereto; and

a plastic jacket enclosing and engaging the proximal portion.

7. A flexible guide wire, comprising:

an elongated inner core wire having a proximal portion and a distal portion the proximal portion of the inner core wire being of uniform diameter and the distal portion is tapered;

a coil spring enclosing the distal portion and fixably attached thereto; and

a plastic jacket enclosing and engaging the proximal portion.

8. A guide wire as described in claim 7, wherein the coil spring is attached to the inner core wire at both ends of the distal portion.

9. A guide wire as described in claim 8, wherein the inner core wire and the coil spring are formed of stainless steel.

10. A guide wire as described in claim 9, wherein the coil spring is attached to the inner core wire by soldering and the

solder forms a distal tip at one end of the coil spring.

Only claims 1, 6 and 7 are independent claims; the remaining claims are dependent on other claims.

During the prosecution of the application by Antoshkiw, the Patent Examiner rejected the original claims under 35 U.S.C. § 103 as obvious over the prior art references of Muller (U.S.P. 3,452,740; Foley Unenforceability Affidavit Exh. 3), Cook (U.S.P. 3,547,103; Foley Unenforceability Affidavit Exh. 4) and Ackerman (U.S.P. 3,612,058; Foley Unenforceability Affidavit Exh. 5). The Muller patent disclosed a manipulable spring guide including a continuous coil and a slidable tensioning wire. The Cook patent disclosed a coil spring guide, including a coil spring surrounding a fine wire, a plastic needle sheath for inserting the guide wire, and a mandrel for stiffness and rigidity. The Ackerman patent disclosed a wire outer casing surrounding an inner core at the distal end and an inner reinforcing tube along the proximal end. Neither the Muller, Cook nor Ackerman patents disclosed the B–D claim features of either a plastic jacket enclosing the proximal portion of the inner core or an elongated inner core having a tapered distal end surrounded by a coil spring.

In response to this office action, Antoshkiw filed an amended application dated December 5, 1972, in which he emphasized that the claimed invention taught the use of a plastic jacket enclosing and engaging the proximal portion of the inner core wire and that this "structural distinction" was not found in the prior art. Foley Unenforceability Affidavit Exh. 2, at 22. The applicant further remarked:

The most important advantages of the present invention are derived through the use of a plastic jacket enclosing the proximal portion of the guide wire. The plastic jacket provides a smooth surface and thereby facilitates ease of insertion which results in less damage to the patient and to the catheter. The smooth surface is easier to clean and eliminates the tendency for clotting to result between the coils of the springs used in the prior art. The plastic jacket provides excellent torque transmission for greater maneuverability of the distal tip and at the same time eliminates the electrical hazard which was present during cardiovascular catheterization when devices of the prior arts were used.

*Id.* at 26–27.

In support of claim 2 of the original application, which was dependent on the original claim 1, the applicant emphasized that claim 2 taught the use of a *tapered* distal portion of the inner core wire. The applicant remarked:

Claim 2 which is dependent upon claim 1 further distinguishes over the prior art by reciting that the distal portion of the inner core wire is tapered. None of the patents cited by the Examiner teach the use of a tapered inner core wire. The Cook patent teaches the use of a mandrel that is tapered which is considerably different than a continuous wire that is tapered at the distal portion....

. . . . .

... The present invention utilizes an inner core wire having a constant diameter throughout the proximal portion and a tapered distal portion so as to provide a uniform increase in flexibility between the proximal portion and the tip of the distal portion. None of the prior art patents teach a device that has a uniform increase in flexibility between the proximal portion and the distal tip. The present invention utilizes a single core wire extending through both the proximal and distal portions. The use of such a wire greatly reduces the possibility of breakage. In several prior art devices the supporting means comprised various segments connected together such as in Cook and Ackerman. For each connection there was an increased possibility of breakage especially at the points of connection between the various segments.

*Id.* at 22, 26.

The Patent Examiner subsequently issued a second office action, dated March 5, 1973, in which she finalized the rejection of original claims 1 and 3 to 6 on the grounds of obviousness over Muller, Cook and Ack-

erman. She allowed, however, original claims 2 and 7 to 10 "in subject matter" (requiring that they be rewritten as independent claims since they were dependent on rejected claims). *Id.* at 30.

In response to the second office action, and after an interview with the Examiner on June 6, the applicant filed another amendment, dated June 14, 1973, in which he further amended claim 1 to include the limitation that the distal end of the jacket terminates at the proximal end of the coil spring and is substantially equal in diameter to the coil spring "such that the jacket forms an extension of the coil spring." *Id.* at 33. Thereafter the Examiner allowed the patent.

Throughout the prosecution of the '841 patent, Antoshkiw and B–D did not disclose to the Patent Examiner that for several years prior to the filing of the application, B–D had been selling guide wires that shared some of the characteristics of the Antoshkiw claim. Specifically, products sold under the marks COPE and TEFLON had a plastic jacket surrounding an inner core, and guide wires sold under the marks FLEXIBLE and SAFEGUIDE had a coil spring surrounding an inner core that was tapered at the distal end. It is undisputed that each of these B–D commercial guide wires was on sale for more than one year prior to the filing of the Antoshkiw application, and that the catalogues describing the products were published more than one year prior to the filing of the application.

As evidenced by catalogue inserts published by B–D's Cardiovascular & Special Instrument Division,[2] B–D sold and offered for sale as early as November 1964 a COPE guide wire that included a plastic Teflon jacket enclosing a stainless steel core. One 1965 B–D advertising brochure described the COPE product as one of B–D's "Best Selling Items."[3] The core of the COPE guide wire was securely sealed and rounded at both ends by a clear Teflon

jacket. The distal tip of the COPE guide wire was flexible, and included a series of small stainless steel cannula segments on a flexible stainless steel braided wire. As noted by B–D, the COPE guide wire did not include a spring and was not torqueable or steerable. The COPE guide wires were specifically sold for use in Seldinger procedures,[4] and were available in two different versions at different times in the 1960s.

As already noted, B–D's TEFLON guide wire also had a plastic jacket that surrounded the inner core and was "securely sealed and rounded at both ends."[5] The inner core was removable and consisted of a stainless steel wire. B–D sold the TEFLON guide wires during the 1960s.

Beginning at the latest about July 15, 1964, B–D made and sold a set of products—initially under the name FLEXIBLE and later under the name SAFEGUIDE—that featured a tapered inner core. The FLEXIBLE/SAFEGUIDE guide wires featured a coil spring guide having a tapered distal core to provide flexibility and to ease passage of the guide through blood vessels in a Seldinger proceeding. The wires came in different lengths and diameters and were available with either a fixed or a movable core.[6]

Bard alleges not only B–D's "corporate knowledge" of the COPE, TEFLON and FLEXIBLE/SAFEGUIDE products at the time of the '841 patent prosecution, but also personal knowledge on the part of Antoshkiw, the inventor. At his deposition, Antoshkiw admitted that he knew of the B–D FLEXIBLE/SAFEGUIDE wire before he developed the subject matter of the '841 patent.[7] Antoshkiw testified, in fact, that he used a FLEXIBLE/SAFEGUIDE guide wire as a prototype of his invention, which he made by stripping off the coil spring from the proximal end of the FLEXIBLE/SAFEGUIDE product and sliding Teflon tubing over the proximal portion

**2.** Foley Unenforceability Affidavit Exhs. 6–12.

**3.** *Id.* Exh. 15.

**4.** *Id.* Exh. 12.

**5.** *Id.* Exhs. 9 & 14; *see also id.* Exhs. 6, 8 & 10.

**6.** *See id.* Exhs. 7–9, 13, 18–19.

**7.** Antoshkiw Deposition, Feb. 25, 1987, Olstein Affidavit Exh. 11, at 41–42.

covering the inner core.[8] Antoshkiw further testified that in 1969 he was aware of the B–D catalogue identified as DX–93, which illustrated the FLEXIBLE/SAFE-GUIDE guide wires.[9] Finally, Antoshkiw testified that in 1971 he knew that his supervisor was working on the COPE guide wires.[10]

Antoshkiw and B–D also failed to disclose the prior art reference of Wappler (U.S.P. 2,118,631; Foley Invalidity Affidavit Exh. 6), although Bard has not alleged that Antoshkiw or B–D did so intentionally or even knew of the Wappler reference. Wappler discloses a catheter stylet comprising a mid-portion 18 mode of a rigid, rod-like, preferably tubular member. The Wappler stylet included a flexible tip portion 19 comprising a helically wound strip of string metal (coil) mounted at one end of the tubular rigid member 18, with a flexible portion 20 mounted on the other end of the rigid element 18. Each of the coil helixes in the Wappler stylet was secured to the tubular rigid portion by soldering. The rigid tube 18 had a diameter substantially equal to the external diameter of the helically wound portion and thus formed a continuation of that portion.

Despite B–D's well known name and long experience in the medical technology field,[11] its efforts to sell guide wires under the '841 patent were unsuccessful. B–D itself sold only $31,000 worth of products under the '841 patent[12] and never licensed any manufacturers under the patent.

Bard, by contrast, has had enormous success in manufacturing and marketing a variety of spring guide wires for use in catheterization procedures. Bard obtained a patent on its guide wires in the name of James Leary, the Bard engineer who developed them.[13] Bard has captured 80 to 90% of the guide wire market[14] and sells millions of dollars worth of guide wires annually.[15]

B–D has accused Bard of infringing the '841 patent by the sale by Bard's U.S. C.I. division of the products with Catalog Nos. 006673 through 006678, 006062 through 006067, and 008950.[16] The accused guide wires have several attributes in common with the guide wire disclosed by the '841 patent, namely: (1) a core wire having a tapered distal portion, (2) a spring extending only over the distal portion, and (3) some type of Teflon jacket or coating around the proximal portion. Like the '841 guide wire, the accused products were designed to provide maneuverability, torqueability and steerability.

Although the claimed invention and the accused products both employ a Teflon jacket or coating surrounding the distal

---

**8.** At his deposition, Antoshkiw described how he made his invention. *See id.* at 102–06. The key portion of that testimony is as follows:

> Q. And it is your testimony that within about a week after November 2, 1970 you built the first prototype of the guide wire?
> A. To the best of my recollection, yes.
> Q. Where did you get the parts to build that prototype?
> A. Well, essentially I took a Safeguide guide wire, which was a product that Becton Dickinson was currently selling, and I cut the spring coil approximately 6 to 8 inches beyond the distal portion of the [guide] wire and cut the proximal end where it was a soldered joint and slid off approximately 4 feet worth of spring coil. Then I slid over the wire some very thin shrink-field Teflon and filled the guide wire.

*Id.* at 102.

**9.** Antoshkiw Deposition, Nov. 9, 1987, Olstein Affidavit Exh. 12, at 110–12. The B–D catalogue identified as DX–93 is attached as Exhibit 7 to the Foley Unenforceability Affidavit.

**10.** *Id.* at 79.

**11.** *See, e.g.,* Foley Unenforceability Affidavit Exh. 7.

**12.** *See* B–D's Response to Bard's Interrogatory No. 46.

**13.** U.S.P. 4,545,390; *see* Olstein Affidavit Exh. 1.

**14.** *See* Three Year Plan of USCI Division of C.R. Bard, Inc., April 1985, Olstein Affidavit Exh. 2, at 19.

**15.** *See* Olstein Affidavits Exhs. 3 & 4.

**16.** For a description of each of these products, see ¶¶ 19–31 of Plaintiff's Statement Pursuant to Local Rule 12(G) with Respect to Infringement and Defendant's Memorandum in Support of Its Motion for Summary Judgment of Non-Infringement, at 13–17. Engineering drawings of the products are attached as Exhibits 1 to 13 of the Crittenden Affidavit.

portion of the guide wire, Bard contends that they do so in a significantly different manner. Bard uses an electrostatic spraying process whereby fine droplets of Teflon primer paint are applied to the bare metal of the guide wires. The wires are later "baked" in an oven to cause the droplets of Teflon primer paint to adhere to the wires. Although the wires are visually inspected to ensure that the Teflon coating is consistent and has not been scraped in handling,[17] the Bard process results in a thin, discontinuous Teflon film. According to Bard, there are areas on the coil spring and proximal core of its guide wires where there are voids, cracks and crevices in the Teflon coating. The metal of the proximal core and spring of the Bard guide wires are plainly visible under magnification through the cracks and discontinuities in the coating. Moreover, bending of the coated guide wires during packaging causes the coating to separate further and become even more discontinuous than after the original application.[18] The Bard engineering specifications for the accused guide wires provide for a coating with a thickness of between .0002 and .0004 inches. In actuality, however, according to Bard, the Teflon coating on the Bard guide wires is even thinner, usually on the order of .00015 inches. Thus, the thickness of the Teflon primer coating on the Bard wires is no more than one-tenth and perhaps less than one-twentieth the thickness of the Bard coil spring.[19] According to Bard, the sole purpose of the Teflon coating on the Bard guide wires is to provide lubricity between the guide wire and the inner surface of the catheters passing thereover during their intended use. The Teflon coating of Bard's guide wires does not, for example, function as an electrical insulator, as has been repeatedly demonstrated in testing.[20] Most important, according to Bard, is that the Bard plastic coating does not terminate at the coil spring and does not have the same thickness as the coil spring, so that the plastic does not act as an extension of the coil spring. Rather, the outer diameter of the *proximal metal core* in the Bard wires is equal to the diameter of the coil spring.[21]

## DISCUSSION

On a motion for summary judgment, the moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In evaluating the merits of a summary judgment motion, the Court must view all the evidence before it in the light most favorable to the nonmovant and must draw all reasonable inferences from that evidence in favor of the nonmovant. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

The Court of Appeals for the Federal Circuit has confirmed the use of summary judgment in patent cases. *See, e.g., Porter v. Farmers Supply Service, Inc.*, 790 F.2d 882, 884 (Fed.Cir.1986); *Brenner v. United States*, 773 F.2d 306, 307 (Fed.Cir.1985); *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed.Cir.1985); *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.*, 743 F.2d 1581, 1583 (Fed.Cir.1984).

I. *Motion for Summary Judgment Based on Patent Unenforceability for Inequitable Conduct*

Bard asserts in its first motion that the patent is unenforceable because of allegedly inequitable conduct by B–D in the prosecution of the patent. Specifically, Bard alleges that B–D failed to reveal to the Patent Examiner that two critical features of the claimed invention—the plastic jacket and tapered distal core—were contained in products already put on the market by B–D itself, and thus were prior art against which the claims would be

---

17. *See* Jones Deposition, March 10, 1988, Olstein Affidavit Exh. 0, at 63, 88–91.

18. Crittenden Affidavit ¶ 8.

19. *Id.* ¶ 9.

20. *Id.* ¶¶ 10–11.

21. *Id.* ¶ 12.

judged.[22] Guide wires sold under the marks COPE and TEFLON had a plastic jacket; guide wires sold under the mark FLEXIBLE (and later SAFEGUIDE) had a tapered distal core. In prosecuting its patent claim, B–D had argued that the prior art lacked these features.[23]

■ The Federal Circuit has established a two-part test for patent unenforceability based on inequitable conduct. A patent is unenforceable when (1) material information is misrepresented or withheld from the Patent Examiner (2) in a manner indicating that the misrepresentation or withholding was intentional. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 872 (Fed.Cir.1988), *cert. denied*, — U.S. —, 109 S.Ct. 2068, 104 L.Ed.2d 633 (1989). Both elements—materiality and intent—must be proven by clear and convincing evidence. *Id.* If any claims of the patent are based on inequitable conduct, then all the claims are unenforceable. *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1559 (Fed.Cir. 1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985).

(A) Materiality

The Court must first determine whether the existence of the COPE, TEFLON and FLEXIBLE/SAFEGUIDE products was material information. The patent code provides that an applicant is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The code further provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and

the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *Id.* § 103. Antoshkiw filed his application on September 15, 1971. Thus the critical date for determining obviousness of the claimed invention is September 15, 1970. Any commercial products or publications describing or suggesting the invention prior to that date would be relevant prior art against which the claimed invention would be evaluated by the Examiner.

■ The standard for determining materiality is established by PTO Rule 1.56(a), 37 C.F.R. § 1.56(a), which provides that "information is material [to the examination of the application] where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *See J.P. Stevens*, 747 F.2d at 1559; *see also Merck & Co. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1421 (Fed.Cir.1989); *In re Jerabek*, 789 F.2d 886, 890 (Fed.Cir.1986). The Federal Circuit has adopted this PTO standard as the "appropriate starting point" because it is the broadest of the various possible tests and "because it most closely aligns with how one ought to conduct business with the PTO." *J.P. Stevens*, 747 F.2d at 1559. Under this broad standard, information, to be material, need not fully anticipate the claimed invention. *Argus Chemical Corp. v. Fibre Glass–Evercoat Co.*, 759 F.2d 10, 12–13 (Fed.Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 231, 88 L.Ed.2d 230 (1985). Indeed, the information need not even be sufficient to render the patent invalid for obviousness under 35 U.S.C. § 103: "That the claims may be patentable over the withheld prior art ... is not relevant. What is relevant is that ... a reasonable examiner

---

22. *See* 35 U.S.C. § 102.

23. B–D's last-minute attempt to argue that it disclosed the FLEXIBLE/SAFEGUIDE product by describing it, though not naming it, *see* Transcript of Oral Argument, at 45–46, 71, is disingenuous. The first portion of the patent quoted by B–D at oral argument describes certain aspects of FLEXIBLE/SAFEGUIDE but does not disclose the tapered distal core feature. The second portion describes not a *tapered* distal core but a distal core of *uniform* diameter, albeit of a lower diameter than the proximal core.

considered [or would have considered] such prior art material under Rule 56(a) in deciding whether to allow the application." *A.B. Dick Co. v. Burroughs Corp.*, 798 F.2d 1392, 1398 (Fed.Cir.1986). On the other hand, prior art that is merely cumulative of disclosed references is immaterial; thus its nondisclosure does not amount to inequitable conduct. *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 992 (Fed.Cir. 1988); *Rolls Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1107 (Fed.Cir.1986); *see Merck*, 873 F.2d at 1420–21.

■■■ Becton Dickinson asserts that the COPE, TEFLON and FLEXIBLE/SAFE-GUIDE products were immaterial to the Patent Examiner's determination in the first instance and, even if initially material, were ultimately immaterial in that they provided redundant, cumulative information. B–D's first line of argument must be rejected because it effectively reduces the question of materiality to whether the undisclosed inventions were identical to the claimed invention.[24] As already noted, the set of inventions that might be considered material to a reasonable examiner is a superset of inventions that would render the claimed invention invalid for obviousness, not a subset. Like the claimed invention, the undisclosed inventions were guide wires used in Seldinger techniques. More importantly, the undisclosed devices shared some of the claimed invention's assertedly crucial features: the COPE and TEFLON products employed a plastic jacket that enclosed (and perhaps engaged—*see infra* Part II(C)) an inner core; the FLEXI-BLE/SAFEGUIDE device not only utilized a tapered distal core but actually served as the prototype of Antoshkiw's invention. Clearly a reasonable examiner would have considered all of the products material in evaluating the patentability of Antoshkiw's invention. The fact that COPE and TEF-LON were not spring guide wires (whereas the claimed invention was) did not destroy their materiality, especially in light of B–

D's own representations in advertising literature that COPE achieved the flexibility of a spring guide.[25] B–D's emphasis on the Examiner's determination that certain uses of plastic jackets were obvious is misplaced for two reasons. First, the Examiner's decision was much narrower than B–D portrays it to be: she merely determined that it would be obvious to "use a surgically acceptable plastic material for the jacket" (which was actually a loose-fitting sheath) on the Muller and Cook inventions and to "*encase* the coil spring of Ackerman in plastic, if desired."[26] The Examiner made no ruling as to the obviousness of using a thick plastic jacket that enclosed and *engaged* the inner core wire. Second, the Examiner's preliminary finding of obviousness, even if correct, does not destroy the materiality of the undisclosed inventions. *A.B. Dick*, 798 F.2d at 1397. Finally, the claims as originally submitted by B–D contained no requirement that the plastic jacket engage the inner core.[27] Intentional failure to disclose information material to an initial claim amounts to inequitable conduct even if the information is immaterial to the claims as allowed. *Driscoll v. Cebalo*, 731 F.2d 878, 884 (Fed.Cir.1984).

As noted, B–D's second line of argument is that, even if material in the first instance, the undisclosed inventions were ultimately immaterial in that they were cumulative of references already before the Examiner. Specifically, B–D asserts that U.S. Patent 3,528,406 disclosed a spring guide wire in which the distal portion of the spring guide wire is tapered, thus rendering a reference to SAFEGUIDE unnecessary. B–D further argues that the COPE and TEFLON references were cumulative in light of the Examiner's determination that the use of a plastic jacket was obvious over the prior art. The Court finds B–D's contentions with respect to COPE and TEF-LON to be ungrounded for the reasons already discussed with regard to materiality in the first instance. With regard to

---

**24.** *See* B–D's Memorandum in Opposition to Unenforceability Motion, at 19–22, 34–35.

**25.** *See* Foley Unenforceability Affidavit Exh. 8.

**26.** '841 Patent File History, Foley Unenforceability Affidavit Exh. 2, at 30 (emphasis added).

**27.** *See id.* at 13.

FLEXIBLE/SAFEGUIDE, the Court finds B–D's arguments to be frivolous. Contrary to B–D's assertions, U.S. Patent 3,528,406 does not disclose the use of a tapered distal core. Rather, it reveals the use of a distal core of *uniform* diameter that is connected to a proximal core of a uniform, greater diameter by a relatively short, intermediate tapered section.[28] B–D's representation to the Court that the '406 patent is cumulative of the FLEXIBLE/SAFEGUIDE device is untenable. Bard has succeeded in showing by clear and convincing evidence that the undisclosed devices were highly material.

■ Moreover, even if the undisclosed devices were immaterial, B–D is estopped from asserting their immateriality (especially that of the FLEXIBLE/SAFEGUIDE device) by virtue of its representations to the Examiner during the application process. In its comments to the Examiner after the initial rejection of the claims, B–D argued that "[n]one of the patents cited by the Examiner teach the use of a tapered inner core wire."[29] B–D went on to make a distinction between the Cook patent, which used a tapered "mandrel," and the claimed invention, which contained a wire having a constant diameter in the proximal portion with a taper only in the distal portion. B–D made a similar argument with respect to the plastic jacket, at one point arguing that if it were obvious to replace the coil spring with the plastic jacket, Ackerman "would have done so."[30] Thus even if the information on COPE, TEFLON and FLEXIBLE/SAFEGUIDE were deemed immaterial, B–D would nevertheless be estopped from arguing in this Court contrary to its position before the Patent Examiner.

(B) Requisite State of Mind

There is no question that Antoshkiw or his attorney withheld material information on the COPE, TEFLON and FLEXIBLE/SAFEGUIDE products from the Examiner. The only remaining question is whether clear and convincing evidence has shown that he or his attorney did so with such a state of mind as to constitute inequitable conduct to warrant unenforceability of the patent. Resolving a conflict in prior case law, the Federal Circuit recently held that a finding of intent to deceive the examiner is necessary to establish inequitable conduct warranting patent unenforceability and that evidence of gross negligence alone is insufficient to infer such an intent. *Kingsdown*, 863 F.2d at 876 (en banc portion of opinion). "[T]he involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." *Id.* In the absence of direct evidence of deliberate scheming, intent may be proven "by a showing of acts the natural consequences of which are presumably intended by the actor." *Hycor v. Schlueter Company*, 740 F.2d 1529, 1540 (Fed.Cir.1984); *Kansas Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1151 (Fed.Cir.1983). "The duty of candor owed the PTO being uncompromising, it would deal a deathblow to that duty if direct proof of wrongful intent were required." *Kansas Jack*, 719 F.2d at 1151. The Federal Circuit has cautioned, however, that intent to mislead or deceive, like other issues of state of mind, is not a matter readily determined within the confines of Fed.R. Civ.P. 56. *KangaROOS U.S.A., Inc. v. Caldor, Inc.*, 778 F.2d 1571, 1576 (Fed.Cir. 1985).

■ The evidence of intent to deceive the Patent Examiner is very strong in the present case. What the applicant failed to disclose were some of B–D's own products that were or had been listed for sale in corporate catalogs. One of these products, the FLEXIBLE/SAFEGUIDE device, actually served as the prototype of Antoshkiw's invention. Antoshkiw has also acknowledged his awareness of the COPE guide wire at the same general time as his appli-

---

**28.** *See* Olstein Affidavit Exh. 6.

**29.** '841 Patent File History, Foley Unenforceability Affidavit Exh. 2, at 22.

**30.** *Id.* at 25.

cation was filed.[31] Thus this case is clearly distinguishable from one in which there is a genuine factual issue as to whether the applicant knew of the undisclosed prior art. Antoshkiw essentially argues that he did not know that the inventions were within the prior art because, he asserts, he genuinely believed that his invention was a quantum leap over the undisclosed devices. This argument, however, is belied by affirmative statements made to the Examiner by Antoshkiw through his patent attorney. After the initial rejection of the claims, the applicant emphasized to the Examiner the claimed invention's use of a tapered distal core and argued that "[n]one of the patents cited by the Examiner teach the use of a tapered inner core wire."[32] The SAFE-GUIDE wire, in fact, employed a tapered distal core, as Antoshkiw undoubtedly knew since a SAFEGUIDE device served as a prototype for his invention. This affirmative misrepresentation to the Examiner is much more egregious than a mere omission and is strong evidence of an intent to deceive her. Moreover, the applicant's failure to cite the COPE guide wire, though less egregious than the affirmative misstatements with respect to SAFE-GUIDE, is especially significant when considered in conjunction with the SAFE-GUIDE misrepresentations.

Antoshkiw has filed an affidavit denying any intent to deceive the Examiner and explaining his failure to cite the COPE, TEFLON and SAFEGUIDE products. The Court finds his affidavit unpersuasive. Nevertheless, because the burden to show intentional conduct by clear and convincing evidence falls on Bard, and in light of the Federal Circuit's pronouncement on the general unsuitability of Fed.R.Civ.P. 56 for determining intent to deceive the Examiner, the Court has no choice but to deny Bard's motion and to afford Antoshkiw and his attorney an opportunity to explain their actions at trial, should consideration of the remaining motions preserve B–D's claims for trial.

## II. Motion for Summary Judgment of Patent Invalidity for Obviousness

Bard's next ground for seeking summary judgment is that the patent is allegedly invalid for obviousness under 35 U.S.C. § 103. That section provides in part that a patent may not be obtained "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." There are four factual inquiries relevant to the question of obviousness: (1) the level of skill in the art, (2) the scope and content of the prior art, (3) the differences between the prior art and the claimed subject matter as a whole, and (4) objective indicia of nonobviousness, such as commercial success, long felt but unsolved needs, the failure of others to meet those needs, etc. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *Panduit Corp. v. Dennison Manufacturing Co.*, 810 F.2d 1561, 1566 (Fed.Cir.), cert. denied, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). In determining obviousness, one must consider the invention as a whole; small differences between the claims and the prior art can therefore give rise to patentability. *See, e.g., Jones v. Hardy*, 727 F.2d 1524, 1529 (Fed.Cir.1984). A combination of prior art features will only be deemed obvious if the prior art references contain a suggestion for so combining their teachings; the hindsight afforded by the invention cannot be used to negate its insight. *In re Fine*, 837 F.2d 1071, 1075 (Fed.Cir.1988); *Panduit*, 810 F.2d at 1568; *ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1577 (Fed.Cir. 1984). In other words, one must "forget what he or she has been taught ... about the claimed invention and cast the mind back to the time the invention was made ... to occupy the mind of one skilled in the art who is presented only with the [prior art] references." *W.L. Gore & Associates*

---

**31.** Antoshkiw Deposition, Nov. 9, 1987, Olstein Affidavit Exh. 12, at 79.

**32.** '841 Patent File History, Foley Unenforceability Affidavit Exh. 2, at 22.

v. *Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir.1983), *cert. denied*, 469 U.S. 851, 105 S.Ct. 172, 83 L.Ed.2d 107 (1984).

■ The '841 patent, having been issued by the PTO, enjoys a statutory presumption of validity under 35 U.S.C. § 282, which may be overcome only by clear and convincing evidence of the obviousness of the claimed subject matter. *Hughes Tool Co. v. Dresser Industries, Inc.*, 816 F.2d 1549, 1555 (Fed.Cir.), *cert. denied*, 484 U.S. 914, 108 S.Ct. 261, 98 L.Ed.2d 219 (1987); *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 730 F.2d 1452, 1459 (Fed.Cir.1984). The introduction of prior art more pertinent than that considered by the Examiner, however, weakens the presumption of validity and eases the burden of proof on the party seeking to have the patent declared invalid. *Kimberly–Clark v. Johnson & Johnson*, 745 F.2d 1437, 1443 (Fed.Cir.1984); *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983); *see also EWP Corp. v. Reliance Universal, Inc.*, 755 F.2d 898, 905 (Fed.Cir.), *cert. denied*, 474 U.S. 843, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985). On the other hand, where the additional prior art cited by the party attacking the validity of the patent is no more pertinent than that considered by the Examiner, the presumption of validity may only be overcome by showing that the Examiner erred in allowing the claims. *American Hoist & Derrick Co. v. Sowa & Sons*, 725 F.2d 1350, 1359 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

**(A) Level of Skill in the Art**

Before reaching the substantive obviousness criteria, the Court must determine the relevant level of skill in the art against which obviousness must be measured. Although there was some disagreement on the issue, both sides now agree that the appropriate level of skill is that of a radiologist who worked with guide wires or any other person, not necessarily an engineer, with experience in guide wire design.[33]

**(B) Scope and Content of the Prior Art**

■ The Court must determine the scope and content of the prior art to which a person skilled in the art would turn in attempting to improve the subject matter of the claimed invention to arrive at that invention. B–D concedes that the SAFE-GUIDE product and the Wappler patent are within the prior art. B–D argues, however, that the COPE and TEFLON products are not within the prior art because they are not spring guide wires. The Court finds B–D's view of the range of prior art to be unduly narrow. The COPE and TEFLON products were guide wire assemblies manufactured and sold by B–D for use in Seldinger catheterization procedures—the very purpose of the claimed invention. More importantly, they featured the use of some type of plastic covering to enclose (and perhaps engage—*see infra* Part II(C)) the inner core. The fact that COPE and TEFLON were not spring guide wires is insufficient to remove them from the realm of relevant prior art because the Antoshkiw invention, featuring a spring coil covering only a portion of the guide wire, was in effect a hybrid between spring guide wires and non-spring guide wires. The relevance of COPE and TEFLON is underscored, as already noted in *supra* Part I(A), by B–D's representations in its own advertising literature that COPE

---

**33.** Bard initially proposed as the appropriate level that of "an engineer with either a bachelors or masters degree and some experience (two to three years) with catheterization guide wire design." Bard's Initial Memorandum in Support of Obviousness Motion, at 31 n. 10. B–D's counterproposal was much broader: "either a radiologist working with guide wires or a person with practical experience in guide wire design." B–D's Memorandum in Opposition to Obviousness Motion, at 17. At oral argument Bard modified its proposal to include "a person who had experience with either radiology or cardiology"—someone with more experience than a bench technician; not necessarily a medical doctor; perhaps an engineer "who had experience in making guide wires or catheters for use in [PTCA] procedures." Transcript of Oral Argument, at 5–7. After B–D stood by its position that the hypothetical person need not have been even an engineer and may have been, for example, a salesperson, *see id.* at 52–53 (statement of Mr. Olstein incorrectly reported as that of Mr. Foley), Bard agreed with B–D's description of the person skilled in the art, *see id.* at 75.

achieved the flexibility of a spring guide wire. The prior art thus includes the COPE, TEFLON and FLEXIBLE/SAFE-GUIDE products as well as the Wappler patent.

### (C) Differences Between the Prior Art and the Claimed Subject Matter as a Whole

Having defined the scope of the prior art, the Court now focuses on the differences, if any, between the prior art and the claimed invention to determine whether the claimed subject matter as a whole would have been obvious at the time the invention was made to a person with ordinary skill in the art.

 Bard argues that all of the significant features of the '841 patent are contained within the prior art. While conceding that no one prior art reference contained all of the relevant '841 features, Bard contends that it would have been obvious to a person skilled in the art to combine the features to achieve the '841 patent. B–D contests both the presence of all features in the prior art and the obviousness of combining them in one invention. The Court will address each of these issues in turn.

### (1) *Presence of the '841 Features in the Prior Art*

In support of its contention that the prior art revealed all of the important features of the '841 patent, Bard argues (1) that the COPE and TEFLON guide wires featured the plastic jacket of the '841 patent and (2) that the FLEXIBLE/SAFEGUIDE product featured the tapered distal core of the '841 patent. While conceding the latter point, B–D contends that the plastic jacket of COPE and TEFLON is not the same feature as that claimed by the '841 patent. The distinction cited by B–D is that the '841 plastic jacket not only encloses the inner core wire but also engages the wire (*i.e.,* is in contact with the wire so that the jacket and wire move in tandem), while the plastic jacket in the COPE and TEFLON products is a loose-fitting sheath that only encloses, and does not engage, the core wire. *See* B–D's Memorandum in Opposition to Obviousness Motion, at 25–26. Rejoining that the COPE plastic jacket in fact engages the inner core wire, Bard offers as proof the brochure description of COPE that indicates that the plastic jacket—like that of the Antoshkiw invention—was heat shrunk onto the core wire and thus necessarily was in contact with the wire. *See* Transcript of Oral Argument, at 68. Based on its own examination of the literature on COPE, the Court finds the evidence inconclusive at this time on the question of whether the COPE plastic jacket engages the inner core wire. This genuine issue of fact is not, however, necessarily material: the sole significance of the engagement of the plastic jacket with the inner core wire was that, according to B–D, it may have contributed to the previously unattained torqueability characteristics of the Antoshkiw invention.[34]

### (2) *Obviousness of Combining the Prior Art Features Into One Invention*

Even if all the prior art features were present in the prior art, it is a separate question whether it would be obvious to combine them all in one device to obtain the claimed invention. Bard contends that the Antoshkiw invention is essentially a combination of the proximal portion of the COPE guide wire (assuming that COPE featured a plastic jacket enclosing and engaging the core wire) and the distal portion of the FLEXIBLE/SAFEGUIDE wire. Bard further argues:

> Since the COPE guide wire itself had a flexible tip, it would have been a *simple*

---

**34.** B–D also contends that another '841 feature—a coil spring enclosing the distal portion of the guide wire and fixably attached thereto—is absent from the prior art in that the prior art coil springs extended over both the proximal and distal portions. *See* B–D Memorandum in Opposition to Obviousness Motion, at 26. The Court prefers to view the partial coil spring as a lesser included aspect of a full-length coil spring. Thus the '841 coil spring feature is within the prior art. It does not necessarily follow, however, that it was obvious to combine a coil-spring-covered distal portion with a plastic-coated proximal portion; this issue is addressed in Part II(C)(2), *infra.*

*matter of design choice* to substitute the flexible tip of the FLEXIBLE/SAFE-GUIDE wire (having the tapered inner core surrounded by the coil spring) for the COPE flexible tip and thus achieve the alleged invention. Alternatively, it would have been obvious to do what the inventor did in making the alleged invention, *i.e.*, strip the coil spring from the proximal end of a FLEXIBLE/SAFE-GUIDE wire and fill in the gap with commercially available Teflon tubing. Bard's Initial Memorandum in Support of Obviousness Motion, at 30 (emphasis added). Drawing on Wappler, who disclosed that selective flexibility could be obtained and the cost of the guide wire could be reduced by using a helical coil at the ends where flexibility was needed and a more rigid tubular-member where flexibility was not needed, Bard contends that "persons with ordinary skill in the guide wire art, at the time the alleged invention was made, routinely selected more or less coil spring or more or less plastic jacket length, depending on what features were desired for the guide wire under consideration. *This is routine design choice, not inventive skill." Id.* at 30–31 (emphasis added) (footnote omitted).

B–D disputes the obviousness of combining a spring coil with a plastic jacket to obtain the Antoshkiw invention. B–D sees nothing in the prior art to suggest such a combination and emphasizes the "unique structural relationship" of the Antoshkiw guide wire that provides previously unattained torqueability and steerability characteristics. B–D's Memorandum in Opposition to Obviousness Motion, at 21–22. The Court, then, must determine whether it would have been obvious to one skilled in the art to combine COPE (assuming the COPE plastic jacket engaged the core wire) with FLEXIBLE/SAFEGUIDE, in light of Wappler, to arrive at the Antoshkiw invention. Was it, in the words of Bard, "a simple matter of design choice"? Or was it, as B–D argues, inventive skill?

To resolve the obviousness question, the Court will take the Antoshkiw invention step by step, at each step determining whether there is any genuine dispute as to the obviousness over the prior art of the inventor's creation thus far. The Court will conduct this analysis for each of the independent claims of the patent, beginning with claim 1.

(a) *Claim 1.* Working from the prior art, one skilled in the art would arrive at claim 1 of Antoshkiw's invention by (1) removing the spring coil from the proximal end of a FLEXIBLE/SAFEGUIDE wire (though not necessarily one with a tapered inner core), (2) replacing the removed section of the coil with a plastic coating of some sort, and (3) using a plastic coating that terminated at the coil spring and was substantially equal in diameter to the coil spring such that the jacket formed an extension of the coil spring. Looking first at Step 1, the Court agrees with Bard that in light of Wappler, a person skilled in the art would, at the time of the Antoshkiw invention, have found it obvious to remove the spring coil from the proximal end of a FLEXIBLE/SAFEGUIDE wire, leaving the coil over only the proximal end, thus achieving selective flexibility and reduced cost. The Wappler patent, which was not before the Examiner, is clear and convincing evidence of this. Wappler expressly taught that reducing the length of the helix spring coil reduced the cost of a guide wire while simultaneously providing flexibility at the tip, where it is needed. *See* Wappler Patent, Foley Invalidity Affidavit Exh. 6, at 2, lines 3–8. Looking next at Step 2, the Court finds as a matter of law that it would have been obvious to then cover the exposed proximal end of the guide wire with a layer of plastic (thick or thin, "jacket" or "coating") similar to that already in use by B–D, Bard and others at the time of the invention. Plastic layers were in such common use at the time, as the Examiner herself noted, that it was just as obvious to use a partial coil spring with a plastic layer as it was to use a partial coil spring alone; the combination was clearly suggested by the prior art. This conclusion does not change—without the limitations of Step 3— even if the plastic layer (following COPE if COPE had the properties alleged by Bard, or for the first time in the art if COPE did

not have such properties) not only enclosed but also engaged the inner core wire, because the engagement property has no significance except in light of the structural advantages achieved in Step 3. Looking finally at Step 3, the Court has at last found a genuine issue of material fact: whether it would have been obvious to a person skilled in the art to use a plastic layer that not only enclosed and engaged the inner core wire but also (a) terminated at the proximal end of the coil spring and (b) was substantially equal in diameter to the coil spring such that the plastic layer formed an extension of the coil spring. It was the latter limitations, after all, that gave the Antoshkiw invention the torqueability and steerability characteristics that B–D so strenuously urges upon this Court. Although Bard is correct that Antoshkiw never used the phrase "unique structural relationship" before the Examiner, *see* Bard's Reply Memorandum in Support of Obviousness Motion, at 19 n. *, he did cite torqueability as one of several features absent from the prior art and present in his invention, *see* '841 Patent col. 1, line 66 through col. 2, line 4; *id.* col. 2, lines 58 through 63. There is thus a genuine issue of material fact as to the obviousness of claim 1 of the Antoshkiw invention.

■ (b) *Claims 6 and 7.* Claims 6 and 7 are nearly identical to each other and will be analyzed together.[35] Working from the prior art, one skilled in the art would arrive at either claim by (1) removing the spring coil from the proximal end of a FLEXIBLE/SAFEGUIDE wire featuring a tapered distal core, (2) replacing the removed section of the coil with a plastic coating of some sort. For the reasons expressed above with respect to claim 1, Step 1 of arriving at claims 6 and 7 was obvious as a matter of law. The presence or absence of a tapered distal core has no bearing on the obviousness issue since the prior art FLEXIBLE/SAFEGUIDE products, which were not before the Examiner, featured · both uniform-diameter and tapered cores; it

would have been equally obvious to start with either. Turning now to Step 2, it is clear from the discussion of claim 1 that it would have been obvious to cover the exposed proximal end of the guide wire with a plastic layer that did not have the characteristics born of the limitations of Step 3 of claim 1—*i.e.*, that did not terminate at the proximal end of the spring coil and have a diameter substantially equal to that of the coil spring so as to form an extension thereof. Therefore claims 6 and 7, if viewed as the independent claims that they purport to be, are invalid for obviousness under 35 U.S.C. § 103.

Rather than discard Claims 6 and 7 entirely, however, the Court will view them as dependent on claim 1, which is still presumed valid unless Bard, at trial, can establish its obviousness by clear and convincing evidence. That is, the Court will read into claims 6 and 7 the limitation expressed in claim 1 that the plastic jacket "includ[es] a proximal end and a distal end, the jacket distal end terminating at the coil spring proximal end and being substantially equal in diameter to the coil spring such that the jacket forms an extension of the coil spring." Rewriting claims 6 and 7 as dependent claims, the Court reaches the following:

6. A guide wire as described in claim 1, wherein the inner core wire has a proximal portion and a tapered distal portion.

7. A guide wire as described in claim 1, wherein the proximal portion of the inner core wire is of uniform diameter and the distal portion is tapered.

In sum, Bard has introduced relevant prior art that was not before the Examiner and has successfully shown by clear and convincing evidence that the prior art renders claims 6 and 7 of the '841 patent invalid for obviousness if viewed as independent claims but presumably valid if viewed as dependent on claim 1. The Court deems it a triable question of fact

---

**35.** The only apparent difference between the two claims is that claim 7 requires the proximal portion of the guide wire to be of uniform diameter while claim 6 does not speak to the shape of the proximal portion. This difference, as will be seen, has no bearing on the viability of claims 6 and 7 as independent claims.

whether one skilled in the art would have found it obvious to combine the prior art features in the unique structural relationship of claim 1 of the patent.

### (D) Objective Indicia of Obviousness

■ One of the objective indicia of nonobviousness that the Court may consider is the commercial success of the claimed invention. *See Graham v. John Deere, supra.* Although B–D's own attempt to market the Antoshkiw invention was largely unsuccessful (amounting to no more than $31,000 in sales), B–D seeks to use Bard's enormous success in the sale of the accused products as evidence of the nonobviousness of the '841 patent. The Court recognizes that, in the face of its ruling that claims 6 and 7 are obvious as independent claims under the subjective obviousness criteria, B–D might argue that those two claims might still be valid as independent claims by virtue of the objective criteria. Even assuming for purposes of this motion, however, that the accused products fall within claims 6 and 7 as issued, the Court finds the subjective indications of obviousness so strong as to clearly negate any objective indications of nonobviousness.

With regard to claim 1, B–D itself has acknowledged that the Bard products are only relevant to the issue of the obviousness of the '841 patent if the accused products are found to infringe the patent. *See* Transcript of Oral Argument, at 51. Resisting the temptation to get ahead of itself, the Court will thus postpone consideration of the objective criteria as they relate to claim 1 until the Court has determined whether there has been infringement of that claim.

### III. *Motion for Summary Judgment of Noninfringement*

As a final ground for seeking summary judgment, Bard contends that as a matter of law its accused products do not infringe the '841 patent, either literally or under the doctrine of equivalents.

■ The issue of patent infringement may be resolved in two steps: (1) interpretation of the claims of the patent and (2) comparison of the claims with the accused device. *SmithKline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 889 (Fed.Cir.1988); *Snellman v. Ricoh Co.*, 862 F.2d 283, 286 (Fed.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 3199, 105 L.Ed.2d 707 (1989); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 837 F.2d 1044, 1054 (Fed. Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Although claim interpretation is a question of law, *Snellman*, 862 F.2d at 287, a dispute as to the meaning of terms in a claim is a question of fact, *Perini America, Inc. v. Paper Converting Machine Co.*, 832 F.2d 581, 584 (Fed.Cir.1987). The *Perini* court held:

> Like all legal conclusions, that conclusion [claim interpretation] rises out of and rests on a foundation built of established (undisputed or correctly found) facts. Interpretation of a claim, or of its scope, should not be assayed until that foundation is in place. If the meaning of terms in the claim, the specification, other claims, or prosecution history is disputed, that dispute must be resolved as a question of fact before interpretation can begin.

*Id.; see also Moeller v. Ionetics, Inc.*, 794 F.2d 653, 657 (Fed.Cir.1986) (reversing summary judgment of noninfringement). Indeed, the Court must always refer to certain extrinsic evidence—the patent specification, prosecution history and other claims—to interpret a disputed claim. *Moeller*, 794 F.2d at 656; *accord SmithKline*, 859 F.2d at 882. Also helpful is expert testimony, including evidence of how one skilled in the art would interpret the claim. *Fonar Corp. v. Johnson & Johnson*, 821 F.2d 627, 631 (Fed.Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988); *see also United States v. Telectronics, Inc.*, 857 F.2d 778, 781 (Fed.Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1954, 104 L.Ed.2d 423 (1989). On the other hand, an inventor is not bound by the ordinary meaning of terms but is free to be his or her own lexicographer. *ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1580 (Fed.Cir.1988). "The ordi-

nary meaning of claim language ... is not dispositive and resort must still be had to the specification and prosecution history to determine if the inventor used the disputed terms differently than their ordinary accustomed meaning." *Id.*

 Patent infringement may be found in either of two ways: literal infringement or infringement under the doctrine of equivalents. Literal infringement occurs when every limitation of the patent is found in the accused device literally. *SmithKline*, 859 F.2d at 889. In the absence of literal infringement, a product nevertheless infringes under the doctrine of equivalents if it performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950).

B–D has alleged infringement of all the independent claims of the '841 patent—claims 1, 6 and 7—both literally and under the doctrine of equivalents. Having saved claims 6 and 7 from invalidity for obviousness by reading them as dependent on claim 1, the Court will confine the present discussion to claim 1, the sole remaining independent claim of the '841 patent.[36]

### (A) Literal Infringement

Claim 1 of the '841 patent claims a flexible guide wire comprising (1) an elongated inner core wire with a proximal portion and a tapered distal portion, (2) a coil spring enclosing the distal portion and fixably attached thereto, the coil spring having a proximal end and a distal end, and (3) a plastic jacket enclosing and engaging the proximal portion, the jacket including a proximal end and a distal end, the jacket distal end terminating at the proximal end of the coil spring and being substantially equal in diameter to the coil spring such that the jacket forms an extension of the coil spring. As grounds for summary judgment of noninfringement, Bard cites two aspects of the claims that it alleges are not found in its accused products. First, Bard argues that the plastic layer on the accused products is not a "jacket" within the meaning of the '841 patent but is instead a "coating" that does not fall within the claims of the patent. Second, Bard contends that even if the plastic layer on the accused products is deemed a "plastic jacket" within the meaning of the patent, the layer does not terminate at the proximal end of the coil spring and is not substantially equal in diameter to the coil spring such that it forms an extension of the coil spring. The Court will address these arguments in turn.

### (1) *Jacket or Coating?*

Bard characterizes its argument that its "coating" is not a "jacket" as more than just semantical: it alleges that the plastic layer (whether called a jacket or a coating) claimed in the '841 patent—when analyzed in light of the patent specifications, the prosecution history and B–D's own admissions—is required to have certain properties that are not present in the plastic layer of the accused products. Bard initially cited over a dozen such missing properties, *see* Bard's Initial Brief in Support of Noninfringement Motion, at 19–20, but has emphasized four: (1) electrical insulation, (2) reinforcement strength and (3) ability to transmit torque, *see, e.g.*, Bard's Reply Brief, at 13.[37] In support of its contention

---

**36.** Were the Court to address the issue of infringement of newly dependent claims 6 and 7, however, the Court notes that B–D's invocation of the claim differentiation rule of claim construction would no longer be well taken. That doctrine—which holds that where some claims are broad and other claims narrow, the narrow claim interpretation may not be read into the broad, *see Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 770 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984)—is no longer relevant in light of the Court's determination that the only way to save claims

6 and 7 from obviousness was to read the narrower aspects of claim 1 into the broader (except for the tapered distal core feature) claims 6 and 7.

**37.** Bard also argues that the '841 "jacket" by definition includes the limitations that the plastic terminate at the proximal end of the coil spring and have substantially the same diameter as the coil spring so that the plastic functions as an extension of the coil spring. The Court prefers to view those characteristics as limitations on the type of jacket that may be used in the

that these properties are required by the patent itself, Bard cites the following excerpts from the "Description of the Invention" in the '841 patent:

> The plastic jacket provides a smooth surface with a low coefficient of friction to facilitate insertion of the guide wire into a vessel while the Teflon jacket provides for excellent torque transmission making the guide wire exceptionally maneuverable.
>
> The use of a plastic jacket eliminates the need for the coil spring to extend over the entire length of the guide wire and thus reduces the amount of spring material it required. The cost of the guide wire is substantially reduced as a result of the reduced amount of extensive [*sic*, expensive?] stainless steel spring material required for the guide wire. Likewise, the tendency towards clot formation is greatly reduced by the smooth surface of the plastic jacket. The possibility of core wire breakage is greatly reduced by the use of the plastic jacket which is in contact with the proximal portion of the core wire and provides reinforcement. The tendency towards spring coil breakage is also reduced by the use of a shorter spring than in those devices heretofore provided. The plastic jacket also provides an additional advantage in that it eliminates the electrical hazard associated with devices of the prior art during cardiovascular catheterization.

'841 patent, col. 3, line 53 through col. 4, line 11.

As noted, Bard also relies on the prosecution history to support its theory that the '841 plastic jacket has certain properties. Specifically, Bard cites the following statement that Antoshkiw made to the Examiner after her initial rejection of the claimed invention:

> The most important advantages of the present invention are derived through the use of a plastic jacket enclosing the proximal portion of the guide wire. The

plastic jacket provides a smooth surface and thereby facilitates ease of insertion which results in less damage to the patient and to the catheter. The smooth surface is easier to clean and eliminates the tendency for clotting to result between the coils of the springs used in the prior art. The plastic jacket provides excellent torque transmission for greater maneuverability of the distal tip and at the same time eliminates the electrical hazard which was present during cardiovascular catheterization when devices of the prior arts were used.

'841 Patent File History, Foley Noninfringement Affidavit Exh. 2, at 7–8.

Bard further supports its argument with what Bard views as admissions by B–D that B–D's "plastic jacket" is not the same as Bard's "plastic coating." These alleged admissions come in two groups: statements made by B–D in advertising literature in the 1970s and statements made by B–D witnesses at their depositions in the present litigation. With regard to the first group, Bard notes that B–D sold two different types of guide wires, one identified by B–D as "TEFLON–COATED" and the other as "TEFLON–JACKETED." *See* Foley Noninfringement Affidavit Exhs. 6–10. In one of its advertisements, called a "Technique Products Bulletin," B–D wrote:

> *What's Special About The TEFLON–Jacketed Guidewire From B–D?*
>
> Everything. There's nothing like it in the marketplace today.
>
> The theory behind the design is this: The optimum in gentleness for the inside of a vessel would be an all-plastic guide, but this is not practical because of an inherent lack of flexibility and proper maneuverability. The TEFLON-jacketed guide was designed to combine all the safety advantages of a smooth, all-plastic guide with the maneuverability of a stainless steel wire.

> . . . . .

> The obvious benefit of the TEFLON-jacketed guide is the extra smoothness of the

claimed invention, and not as inherent aspects of the plastic "jacket." Accordingly, these characteristics will be addressed in the subpart of the opinion immediately following the current discussion.

extruded TEFLON jacket. The extrusion process squeezes melted TEFLON between a die (which shapes the outer diameter) and a mandril (which forms the inner diameter). The result is a TEFLON 'tube' with an outer surface that has a super-smooth, glass-like finish. It will slide easily into catheters, and provides enough 'stiffness' to straighten curved catheters. Yet the entire guide is still very maneuverable because of its stainless steel core and flexible distal tip.

Foley Affidavit Exh. 7, at D000691. The bulletin goes on to differentiate a plastic coat from a plastic jacket:

> Unlike a TEFLON coat applied with a simple dipping process, the TEFLON jacket resists flaking or chipping. There are no gaps or ridges from spring wire coils to give blood an extra place to collect or clot.

*Id.* In a separate bulletin, B–D explained the difference between a plastic coat and a plastic jacket as follows:

> *TEFLON Coating vs. Jacketed*
>
> There are variations in coating processes and high-magnification photos have shown that the coating may not give complete coverage to the stainless steel. Flexing of the wire during usage understandably can open uncoated crevices in the coated wire design. The thickness of the TEFLON–Jacket assures complete coverage, and bending it cannot expose the wire.

*Id.* Exh. 8, at D000693.

B–D has responded with the black-letter principle that it is the claims of the patent, not the accompanying specifications, that control. "Specifications teach. Claims claim." "[C]laims are infringed, not specifications." *SRI International v. Matsushita Electric Corp.*, 775 F.2d 1107, 1121 & n. 14 (Fed.Cir.1985). B–D contends that the '841 patent did not require that the plastic jacket have all the properties cited by Bard. Rather, B–D argues, the '841 patent used the terms "jacket" and "coating" interchangeably. In support of its position, B–D has submitted the affidavit

of Dr. Robert White. *See* White Affidavit ¶ 39; *id.* ¶ 25.

Based on the White Affidavit, the Court will assume, without deciding, that the definition and scope of the term "plastic jacket," as used in the '841 patent, are genuine issues of material fact. As will become apparent, the Court's reluctance to decide the issue will have no effect on the outcome of the present summary judgment motion.

(2) *Extension of Coil Spring?*

██ Bard's second basis for seeking summary judgment of noninfringement is its contention that the accused products do not literally infringe Claim 1 because their plastic covering (whether a "jacket" or a "coating") does not (1) terminate at the proximal end of the coil spring and does not (2) have a thickness substantially equal to that of the coil spring so that (3) the plastic forms an extension of the coil spring. Since the above limitations are contained in clear claim language, the Court construes the scope of the claims to include the limitations as a matter of law. *Cf. Palumbo v. Don–Joy Co.*, 762 F.2d 969, 974 (Fed.Cir.1985). Actually, the first- and second-numbered limitations are the sole independent limitations, with the third—the plastic functioning as an extension of the coil spring—resulting from the first two.

In support of its contention that its products do not contain the plastic jacket mandated by the '841 patent, Bard has put forth the Affidavit of James Crittenden. Crittenden avers that the Teflon coating on the Bard wires is approximately .00015 inches thick whereas the coil spring is approximately .004 inches thick. Since the Bard Teflon coating is on the order of one-twentieth as thick as its coil spring, Crittenden avers, the Bard plastic coating does not have a thickness "substantially equal in diameter to the coil spring."[38] Crittenden next avers that the Bard Teflon coating does not function as a continuation of the spring by itself making the outer diameter of the guide wire in the proximal portion continuous with the outer diameter of the coil spring. Rather, according to

**38.** Crittenden Affidavit ¶ 12.

Crittenden, it is the outer diameter of the *proximal metal core* of the Bard wires that is equal to the diameter of the coil spring. *Id.*

B–D has responded to the Crittenden Affidavit with a two-fold argument. First, B–D disputes the *factual* contention that the Bard Teflon coverings are as thin as Crittenden avers. Second, B–D disputes the *legal* significance of such a difference in diameter, if it is found to be a fact. The Court will address B–D's arguments in turn.

In support of its factual argument, B–D relies principally on the specifications of the Bard products, which call for a Teflon covering with a thickness in the range of .0002 to .0004 inches. B–D cites the deposition of Larry Jones (as Bard's designated witness under Fed.R.Civ.P. 30(b)(6)), who confirmed that the Bard products specify that range for the plastic covering.[39] B–D contends that at no point did Jones testify that the Teflon covering on the Bard products did not fall within the specifications. B–D's Brief in Opposition to Noninfringement Motion, at 16. As Bard points out, however, Jones in fact did testify at one point that .0002 was the *upper* limit on the thickness of the Teflon.[40] In any event, when the Crittenden Affidavit and Jones Deposition are read together in the light most favorable to B–D (the nonmovant), the best that can be said for B–D's case is that a small percentage

of Bard's guide wires are put on the market with a plastic covering approaching .0004 inches in thickness. The Court will so assume for purposes of this motion.

B–D next seems to dispute the legal significance of a finding that the Bard plastic coverings have a "thickness" substantially different from that of the coil spring. B–D argues: "In the accused wires, although the thickness of the Teflon coating is less than the thickness of the spring, as applied to the wire, the *outer diameter* of the Teflon coating is substantially equal to that of the spring." B–D's Brief in Opposition to Noninfringement Motion, at 39 (emphasis added). B–D's focus on the *outer* diameter of the plastic covering might be a reasonable interpretation of the term "diameter," as used in the '841 patent, but for the limitation in claim 1 that the substantial diametric equality results in the plastic covering "form[ing]" an extension of the coil spring." The proper focus, then, should be on both the *outer and inner* diameters (*i.e.*, the thickness) of the plastic covering and the coil spring, for it is only upon the substantial equality of both that the plastic may form an extension of the coil spring.

All the evidence before the Court pertaining to the infringement issue leads to only one possible conclusion: Bard's accused products do not literally infringe claim 1 of the patent. Even those few Bard products whose plastic covering may have the maximum thickness that the evidence indicates

**39.** *See* Jones Deposition, March 10, 1988, Olstein Affidavit Exh. O, at 38–40.

**40.** Q. Now, is there any procedure at Bard for measuring the thickness of the coating as part of QA or QC?

A. The only way we can accurately do that with this thickness of coating is to scrape some Teflon off physically and take a micrometer and measure the core wire and then slide over and measure the OD with Teflon and subtract out.

Q. Let me just make sure—you strip off part of the Teflon off the wire?

A. To measure the core wire. So you've got the OD of the core wire or the spring, whichever, and then move over to the Teflon-coated portion of it, measure it, subtract the OD of the core wire out.

Q. But now let me ask you this: As part of the normal QA or QC procedure for causing

rejection or analyzing manufacturing lines, is there a test by which they strip back part of the coating to measure the difference in thickness between the coated and uncoated portion?

A. I believe there is officially not a test specifically for that.

Q. But do you want to qualify that? I gather from the look on your face—

A. *There's no way the product would get out with over a .0002 thickness.*

Q. What I'm trying to figure out is how is that determined?

A. Because there are tolerances on all of the other joints, like the braze joints and the spring and the core wire, there is a maximum tolerance on those, and there's also a maximum tolerance on the product, the product gets measured.

Jones Deposition, March 10, 1988, Olstein Affidavit Exh. O, at 18–19 (emphasis added).

is possible cannot as a matter of law literally infringe claim 1 of the patent because the thickness of the plastic covering (.0004 inches) would still be only one-tenth the thickness of the coil spring (.004 inches). The Court at the summary judgment stage could not be certain whether a plastic covering of three-quarters, one-half or even one-fourth the diameter of the coil spring would be "substantially equal in diameter to the coil spring such that the [plastic] forms an extension of the coil spring." There is no genuine issue, however, whether a plastic covering of one-tenth or less the diameter of the coil spring could meet that description; the diameter of such a covering would not even be "on the order of" the diameter of the coil spring. Therefore, as a matter of law, Bard's accused products do not literally infringe claim 1 of the '841 patent.

(B) Infringement Under the Doctrine of Equivalents

B–D also alleges infringement of claim 1 under the doctrine of equivalents. That is, B–D alleges that the accused products perform substantially the same function in substantially the same way to achieve substantially the same result. Claim 1 of the '841 patent, however, clearly does not encompass devices whose plastic coverings do not terminate at the proximal end of the coil spring and are not substantially equal in diameter to the coil spring: in the absence of these two features, the plastic covering cannot possibly function as an extension of the coil spring and thus cannot contribute to the torqueability and steerability features that are the key to the presumptive nonobviousness of the invention. It is the *inner core wire* of the accused products, and not the plastic covering, that functions as an extension of the coil spring.[41] This is a dramatically different

41. *See* Crittenden Affidavit ¶ 12(3).

way of achieving torqueability and steerability. In other words, even if the accused devices achieve substantially the same *result* (torqueability and steerability), they do not do so by performing substantially the same *function* in substantially the same *manner*. As a matter of law, then, there is no infringement under the doctrine of equivalents.

## CONCLUSION

There are genuine issues of material fact as to whether the '841 patent is unenforceable because of inequitable conduct before the Patent Examiner on the part of the inventor or his attorney and whether claim 1 of the patent (and all its dependent claims, including, by judicial construction, claims 6 and 7 and their dependent claims) is invalid for obviousness over the prior art. There is, however, no genuine issue of fact as to infringement of claim 1 (and all its dependent claims, including claims 6 and 7 and their dependent claims); Bard has not, as a matter of law, infringed claim 1 or any other claim of the patent. Bard is therefore entitled to summary judgment of noninfringement. The factual issues as to unenforceability and invalidity are thus moot.

An order entering summary judgment in favor of defendant Bard and against plaintiff B–D is attached hereto.

## ORDER

For the reasons set forth in the opinion of the Court filed herewith,

It is on this 28th day of July, 1989,

ORDERED that summary judgment is granted in favor of defendant C.R. Bard, Inc. and against Becton Dickinson and Company.

PATENTED FEB 5 1974

APPENDIX A

3.789.841

FIG.1

FIG.2

INVENTOR.
WILLIAM T. ANTOSHKIW